Christina A. WOODS–DRAKE, et al.,
Plaintiffs-Appellants,

v.

C. L. LUNDY, Defendant-Appellee.

No. 80–3591.

United States Court of Appeals,
Fifth Circuit.

Feb. 18, 1982.

Frank R. Parker, Lawyers' Committee for Civil Rights, Jackson, Miss., Barbara Phillips, Washington, D.C., for plaintiffs-appellants.

Upshaw, Schissel & Ladner, Heber Ladner, Jr., George Edward Pickle, Jr., Jackson, Miss., for defendant-appellee.

Before CLARK, Chief Judge, GOLDBERG and WILLIAMS, Circuit Judges.

GOLDBERG, Circuit Judge:

Plaintiffs brought this action under the Fair Housing Act[1] and federal civil rights statutes,[2] alleging that their landlord evicted them because they had entertained black guests in their rented apartment. After trial, the district judge found that the defendant landlord had indeed conditioned plaintiffs' continued tenancy upon their agreement to no longer receive black guests. Nevertheless, the trial judge concluded that defendants' conduct did not violate federal law, and that plaintiffs had not sustained any damages. After careful review of the record in this case, we conclude that the district court's findings as to both liability and damages must be reversed.

## FACTS

Plaintiffs James Drake, a white male, and his wife, Christina Woods-Drake, a Mexican-American, entered into an agreement in October, 1978 with defendant Charles Lundy to rent one of four apartments owned by defendant in Lexington, Mississippi. Kenneth Fujimoto, a Japanese-American, moved into the apartment in November, with Mr. Lundy's permission. Mr. Drake is a minister in the United Church of Christ; Mr. Fujimoto is his co-worker.

Plaintiffs and defendant initially enjoyed a cordial relationship. Mr. Lundy made no complaints to plaintiffs about their conduct as tenants. However, on November 16, 1978, plaintiffs hosted a dinner party at their apartment. Their guests included three black persons. Mr. Lundy learned from another tenant that black persons had visited plaintiffs' apartment. On the following day, according to Mr. and Ms. Woods-Drakes' testimony, Mr. Lundy went to plaintiffs' apartment and told them that they had created a "disturbance," and that they would have to move if they did not stop causing this "disturbance." When pressed by plaintiffs for further explanation, Mr. Lundy said that by "disturbance," he meant the people plaintiffs had brought into the house as guests. According to Mr. and Ms. Woods-Drake, they informed Mr. Lundy that they had a right to have blacks as guests, and that it was against the civil rights laws to evict them for this reason. Mr. Lundy reiterated his intention to evict plaintiffs if they continued to have these guests at their apartment. Several days after the encounter of November 17, plaintiffs received a letter from defendant informing them that he would not rent to them after December 31, 1978. Plaintiffs vacated the apartment shortly thereafter.

In January, 1979, plaintiffs filed a complaint against Mr. Lundy with the Department of Housing and Urban Development ("HUD"). HUD's attempts to resolve plaintiffs' complaints through informal means of conference and conciliation were

1. 42 U.S.C. § 3601 *et seq.*

2. 42 U.S.C. §§ 1981 and 1982.

unsuccessful. Plaintiffs then brought suit against Mr. Lundy in the United States District Court for the Southern District of Mississippi under 42 U.S.C. § 3604(a) and (b) (the "Fair Housing Act") and 42 U.S.C. §§ 1981 and 1982 [3] seeking compensatory and punitive damages.[4]

In the trial, plaintiffs called seven witnesses: James Drake, Christina Woods-Drake, Kenneth Fujimoto, one of the black persons who had been a guest at their apartment, and three present or former tenants. Plaintiffs also introduced into evidence a HUD investigative report which included the following findings: (1) Mr. Lundy had never had a black tenant, (2) four white tenants had been evicted by Mr. Lundy in May, 1979 because blacks helped move the tenants into their apartment and because the tenants hosted a birthday party at their apartment for a black co-worker, (3) although Mr. Lundy told HUD investigators he evicted plaintiffs because their cars blocked the driveway, there had been no complaints to Mr. Lundy about cars belonging specifically to plaintiffs or to their guests, and (4) plaintiffs' co-tenants had never complained to Mr. Lundy about plaintiffs making noise or disturbances. Defendant Lundy did not testify, nor did he present any witnesses or evidence on his behalf.

In accordance with plaintiffs' uncontradicted testimony, the district court found that, "On November 17, 1978, the defendant threatened to evict the plaintiffs if they continued to receive black persons as guests in their apartment." Nevertheless, the district court found that defendant was not liable under the Fair Housing Act [5] because his decision to discontinue renting to plaintiffs was not based on "race". The trial judge "inferred" that Mr. Lundy was antagonized by the presence in his apartment of individuals who were actively engaged in a boycott which defendant opposed,[6] and by plaintiffs' practice of blocking a driveway with their cars. The trial judge also stated, possibly as alternative grounds for his decision, that plaintiffs sustained no actual damages, and that they presented no evidence of vindictiveness or oppressiveness on the part of defendant to give rise to punitive damages. Accordingly, judgment was entered in favor of the defendant.

## SUMMARY

Reversal and remand of this case is so clearly compelled by the facts and the law that we engage in only an exiguous, rather than an exegetic, analysis. The district court found that, "defendant threatened to evict plaintiffs if they continued to receive black persons as guests in their house." It is well established that such conduct—dis-

**3.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

Sections 1981 and 1982 are similar in language, legislative history, and purpose. See Developments in the Law—Section 1981, 15 Harv.C.R.—C.L.Rev. 29, 109. Since the language of Section 1982 refers specifically to the use of real property, this opinion will discuss

the parties' rights and duties under that section alone. We recognize, however, that both 42 U.S.C. § 1981 and § 1982 provide a cause of action for housing discrimination. In addition, the Fair Housing Act provides an independent statutory remedy to persons complaining of discrimination in the provision of housing. Marable v. H. Walker & Associates, 644 F.2d 390, 395 n.16 (5th Cir. 1981); Dillon v. AFBIC Development Corp., 597 F.2d 556, 561 (5th Cir. 1979).

**4.** Jurisdiction was based on 28 U.S.C. § 1343(4) and 42 U.S.C. § 3612(a).

**5.** The district court did not address plaintiffs' claims under 42 U.S.C. §§ 1981 and 1982.

**6.** This inference was drawn despite the fact that Mr. Lundy himself has never stated, either in his answer to plaintiffs' complaint or at trial, that his reason for evicting plaintiffs was related to opposition to the boycott in Lexington.

crimination against whites because of their association with blacks—is proscribed by 42 U.S.C. § 1982 and by the Fair Housing Act. Moreover, under both the Fair Housing Act and under Section 1982, plaintiffs need not show that racial animus was the *sole* motivation for eviction; only that race was a significant factor. Accordingly, it is irrelevant that defendant Lundy may also have been angry at plaintiffs for violating his parking rules, or that Lundy disagreed with plaintiffs' guests' political views, as the district court "inferred". So long as the race of plaintiffs' guests was a significant factor in defendant's decision to evict plaintiffs, the eviction was in violation of Section 1982 and of the Fair Housing Act. Given the district court's finding that defendant evicted plaintiffs because plaintiffs had black persons as guests, the conclusion of liability under Section 1982 and under the Fair Housing Act is inescapable. Finally, when plaintiffs were forced to leave their apartment, and to locate and move into other quarters, a finding that plaintiffs sustained no damages as the result of their unlawful eviction is clearly erroneous.

A. *The Scope of 42 U.S.C. § 1982 and of the Fair Housing Act*

■ It is well-established that whites have a cause of action under Section 1982 when discriminatory actions are taken against them because of their association with blacks. In *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 404–405, 24 L.Ed.2d 386 (1969), plaintiff Sullivan, a white member of a private corporation organized to operate a community park, was expelled from the corporation for attempting to lease his home to a black family. The Supreme Court held that Sullivan's expulsion was in violation of Section 1982, reasoning that to allow discrimination against whites for advocating the rights of blacks "would give impetus to the perpetuation of racial restrictions on property." 90 S.Ct. 400, 404. Thus, in keeping with the aims of the civil rights laws, the courts have held that denial of housing to whites because of their association with blacks violates Section 1982. *See Bills v. Hodges*, 628

F.2d 844, 845 (4th Cir. 1980) (attempted eviction of white tenants because of their biracial dating and entertainment practices enjoined under Section 1982); *Bishop v. Pecsok*, 431 F.Supp. 34, 37 n.4 (N.D. Ohio 1976) (denial of housing to white man because of wife's race violates Section 1982); *Lamb v. Sallee*, 417 F.Supp. 282, 287 (E.D. Ky.1976) (denial of housing to white tenant because of roommate's race violates Section 1982); *Walker v. Pointer*, 304 F.Supp. 56, 58–62 (N.D.Tex.1969), *cited with approval in Evans v. Tubbe*, 657 F.2d 661, 662, n.2 (5th Cir. 1981) (eviction of whites for entertaining black guests violates Section 1982). *See generally Developments in the Law— Section 1981*, 15 Harv.C.R.–C.L.Rev. 29, 75–76, 142–146 (1980).

■ Not only was defendant's conduct— threatening to evict plaintiffs if they continued to have black guests—a violation of Section 1982; such conduct is also prohibited by the express terms of the Fair Housing Act. 42 U.S.C. § 3604(b) reads, in relevant part, "[I]t shall be unlawful . . . to discriminate against *any person* in the terms, conditions, or privileges of . . . rental of a dwelling . . . because of race . . ." (emphasis added). The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction, in keeping with Congress' intent in passing the Fair Housing Act of replacing racially segregated housing with "truly integrated and balanced living patterns." *Trafficanti v. Metropolitan Life Insurance Company*, 409 U.S. 205, 93 S.Ct. 364, 368, 34 L.Ed.2d 415 (1972) *quoting statement of Senator Mondale*, 114 Cong.Rec. 2706. It is evident that when a landlord imposes on white tenants the condition that they may lease his apartment only if they agree not to receive blacks as guests, the landlord has discriminated against the tenants in the "terms, conditions and privileges of rental" on the grounds of "race." Therefore, the imposition upon white tenants of a rule that they may not receive black guests violates the Fair Housing Act. *United States v. L & H Land Corp., Inc.*, 407 F.Supp. 576, 579 (S.D.Fla.1976). *Cf. Trafficanti v. Metropolitan Life Insurance Co., supra* (whites have

standing to sue under the Fair Housing Act for loss of interracial association due to apartment owner's racially discriminatory tenant selections).

## B. Discriminatory Motivation

■ The district court found that defendant Lundy was angered by what he thought to be plaintiffs' disregard of his parking rules, and that Mr. Lundy was antagonized by the presence in his building of people engaged in a boycott of Lexington merchants. The trial judge apparently concluded that if defendant could justify his termination of plaintiffs' lease at least in part on these nonracial grounds, the lease termination would not violate the Fair Housing Act or Section 1982, even despite the district court's finding of fact that "defendant threatened to evict the plaintiffs if they continued to receive black persons as guests in their apartment." This conclusion is erroneous.

It is no defense under Section 1982 or under the Fair Housing Act that racial animus was not a defendant's *sole reason* for denial of housing. Plaintiff need only prove that race was one significant factor in defendant's dealings with them in order to establish a violation of the Fair Housing Act, *Marable v. H. Walker & Associates*, 644 F.2d 390, 395 (5th Cir. 1981); *Taylor v. Fletcher Properties, Inc.*, 592 F.2d 244, 247 n.6 (5th Cir. 1979); *Payne v. Bracher*, 582 F.2d 17, 18 (5th Cir. 1978); *Burris v. Wilkins*, 544 F.2d 891 (5th Cir. 1977); *United States v. Pelzer Realty Co., Inc.*, 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); or of Section 1982. *Marable v. H. Walker & Associates, supra; Payne v. Bracher, supra; Gore v. Turner*, 563 F.2d 159, 167 n.5 (5th Cir. 1977).

■ The record in this case clearly shows that race was a significant factor in defendant's decision to terminate plaintiffs' lease.

Plaintiffs testified that Mr. Lundy told them they would have to leave because they were causing a "disturbance," and that by disturbance, he meant "the nigger trash you've been bringing in the house." It is uncontroverted that prior to the filing of this action, Mr. Lundy had never rented to blacks.[7] Moreover, a former tenant of Mr. Lundy's, Donna Testa, testified at trial that Mr. Lundy had evicted her and her roommates (all whites) because blacks visited their apartment. Ms. Testa testified that on two separate occasions, Mr. Lundy told her that he did not want "niggers" in his house. HUD's report, introduced into evidence at trial, also found that Ms. Testa had been evicted for having blacks as guests in her apartment.

■ In sum, there is ample evidence to support the district court's finding that Mr. Lundy evicted plaintiffs because they had black guests. Discrimination in the provision of housing to whites because of their association with blacks violates both Section 1982 and the Fair Housing Act. Because Mr. Lundy's decision to terminate plaintiffs' lease was based at least in part on statutorily proscribed grounds, Mr. Lundy is liable under both Section 1982 and the Fair Housing Act. Thus, it is immaterial that the district court found that Mr. Lundy had other reasons, in addition to the race of plaintiffs' guests, for terminating plaintiffs' lease. We agree with our brethren in the Seventh Circuit:

> [R]ace is an impermissible factor in an apartment rental decision and ... it cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination. We find no acceptable place in the law for partial racial discrimination.[8]

## C. Damages

■ The district court found that plaintiffs sustained no "actual damages," and

---

7. In housing cases, a history of not renting to blacks is relevant in proving racial discrimination. *Marable v. H. Walker & Associates, supra* at 397 n.20; *United States v. Reddock*, 467 F.2d 897, 899 (5th Cir. 1972).

8. *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 349–350 (7th Cir. 1970) (emphasis in original).

that there was nothing in defendant Lundy's conduct to "give rise to any consideration of punitive damages." After reviewing the evidence and record, this Court has "the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), and therefore holds that the district court's damage findings are clearly erroneous.

■ The district court's findings that plaintiffs sustained no actual damages as a result of having to move from defendant's apartment to another dwelling defies reason. Inevitably, there are costs involved in searching for and moving into another residence. In this case, plaintiffs introduced into evidence a detailed list of out-of-pocket costs incurred by them in locating another dwelling and in moving their belongings. The district court is directed to examine these costs carefully, and to award plaintiffs an amount sufficient to compensate them for their actual losses. In doing so, the district court should take into account the inferior nature of the Woods-Drakes' new residence and other damages occasioned by the relocation, assuming there is causation between the eviction and the injury. *See Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977).

The district court made no finding as to damages claimed by plaintiffs for emotional distress. It may be presumed that some degree of emotional distress will accompany an eviction so clearly motivated by racial animus as this one. *See Gore v. Turner, supra* at 164. The record contains undisputed testimony by plaintiffs as to the embarrassment and humiliation they suffered, including strained relationships at work and among acquaintances, as a result of their eviction. Accordingly, the district court is instructed to award plaintiffs an amount which will fairly compensate them for this emotional distress.

■ The district court found "there was no evidence of any vindictiveness or oppressiveness on the part of this aged landlord to give rise to any consideration of punitive damages."[9] Considering the evidence as a whole, this finding is clearly erroneous. Plaintiffs testified that they informed defendant Lundy he was in violation of the civil rights laws in imposing on them a condition that they not receive black guests. Defendant disregarded this warning, and proceeded to terminate plaintiffs' lease. According to plaintiffs, Lundy expressed his racial animus in the crudest terms, referring to plaintiffs' guests as "nigger trash."[10] Clearly, Mr. Lundy's behavior amounts to a wilfull and gross disregard of plaintiffs' rights under Section 1982 and the Fair Housing Act. Moreover, the evidence indicates a history of discrimination on Mr. Lundy's part: he had never rented to black tenants, and had previously evicted other white tenants who received black guests. Therefore, the district court is directed to assess against Mr. Lundy an amount of punitive damages[11] sufficient to

9. Defendant has argued that punitive damages should not be awarded in this case because plaintiffs failed to introduce evidence of defendant's net worth. It is true that in *Fountila v. Carter*, 571 F.2d 487, 492 (9th Cir. 1978), the court noted that defendant's net worth was an important factor for the jury to consider in determining an amount of punitive damages. However, we adopt the rule that it is defendant, and not plaintiff, who must carry the burden of introducing evidence of net worth if defendant wishes these facts to be considered in awarding punitive damages. *See e.g., Zarcone v. Perry*, 572 F.2d 52, 56 (2nd Cir. 1978); *Tri-Tron International v. Velto*, 525 F.2d 432, 438 (9th Cir. 1975). In the instant case, defendant was on notice that plaintiffs sought punitive damages under both Section 1982 and the Fair Housing

Act. Nevertheless, defendant made no effort to introduce evidence of his financial position; information particularly within his power to produce. Therefore, punitive damages shall be awarded despite incomplete knowledge of defendant's financial position.

10. Defendant does not deny using this term, which is acknowledged to be grossly pejorative, but instead asks us to consider defendant's "age and environment." In considering these factors, we note that it is precisely these ingrained and historical prejudices which the civil rights laws were enacted to combat.

11. In determining this amount, it should be noted that defendant is liable under both 42 U.S.C. § 1982 and under the Fair Housing Act;

deter him from continued violations of the civil rights laws. *See Gore v. Turner, supra.*

Finally, as the prevailing party in this civil rights suit, plaintiffs shall be awarded attorneys' fees.[12] Plaintiffs have prevailed on their claims under both 42 U.S.C. § 1982 and under the Fair Housing Act. They are therefore entitled to benefit from the more liberal provisions of 42 U.S.C. § 1988, which allow recovery of attorneys' fees without consideration of plaintiffs' financial circumstances, as is required by 42 U.S.C. § 3612(c). *Dillon v. AFBIC Development Corporation,* 597 F.2d 556, 564 (5th Cir. 1979); *Bunn v. Central Realty,* 592 F.2d 891, 892 (5th Cir. 1979) (per curiam). In arriving at an attorneys' fee award, the district court should follow the now familiar guidelines set forth by this Court in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), and its progeny.

REVERSED AND REMANDED.

and that the limit on punitive damages contained in 42 U.S.C. § 3612(c) does *not* limit the amount of punitive damages which may be assessed under 42 U.S.C. § 1982. *Miller v. Apartments and Homes of N. J., Inc.,* 646 F.2d 101, 110–111 (3rd Cir. 1981); *Dillon v. AFBIC Development Corporation,* 597 F.2d 556, 563–564 (5th Cir. 1979); *Fountila v. Carter,* 571 F.2d 487, 494 (9th Cir. 1978).

12. Attorneys' fees are awardable for work done at both the trial court and appellate court level. *Cresham Park Community Organization v. Howell,* 652 F.2d 1227, 1248 (5th Cir. 1981); *Morrow v. Dillard,* 580 F.2d 1284, 1300 (5th Cir. 1978).

