United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 9, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-11304

HAROLD COX; SHIRLEY DAVIDSON; ROBERT STUBBLEFIELD; CYNTHIA
HERRING; ELOISE EDWARDS; BETTY CURLEY; LEO EASTER,

Plaintiffs-Appellants,

versus

CITY OF DALLAS TEXAS; ET AL,

Defendants,

CITY OF DALLAS TEXAS

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, JONES and DeMOSS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Asserting racial discrimination, homeowners sued the City of
Dallas under the Fair Housing Act and 42 U.S.C. §§ 1981 and 1983
for persistent failure to police the operation of an illegal dump
near their homes. The district court granted summary judgment to
the City on the Fair Housing Act claim and ruled for the City on
the §§ 1981 and 1983 claims after a bench trial. We affirm.

I

The City annexed the Deepwood neighborhood in 1956 and zoned

it residential. In 1963, the City issued a certificate of occupancy for a gravel pit, part of a sand and gravel mining operation, at 523 Deepwood Street. The pit required a certificate because it was a non-conforming use. The City also re-zoned as industrial a portion of the 85-acre site and issued a specific use permit for a mining operation.

Plaintiffs purchased homes in Deepwood between 1970 and 1978. It was a predominately white neighborhood according to the 1970 U.S. Census. By the 1980 Census, it was predominately black. During the early years of this decade of racial transition, there was open dumping of solid waste at the site, prompting visits to the site by City and state officials. Their response was a call for continuing surveillance.

Terry Van Sickle owned V.V. Construction. He also owned the site from 1982 through 1992. In March of 1982, V.V. Construction applied for a permit to remove sand and gravel from the site, assuring the City that it would fill the old pits with solid waste. The permit was issued the following month.

Within six months, one of the plaintiffs in this action filed a complaint with the City, alleging massive illegal dumping at the site. The City responded that Van Sickle had been cited for improperly conducting a sanitary landfill operation in a residentially zoned area. Weekly re-inspections followed but, as late as December 9, 1982, had detected no additional illegal dumping. Plaintiffs had a different take. They continued to

2

complain at City Council meetings about dumping. In the first four months of 1983, residents appeared five times at City Council meetings, each time expressing concern about the site; in particular, they voiced concerns about truck traffic, noise, air pollution, and illegal dumping.

On February 4, 1983, responding to these complaints, the Assistant City Manager advised the mayor and the City Council that Van Sickle had been fined for operating a sanitary landfill on the site and that illegal dumping had ceased. The manager offered the view that once truck traffic to the site was diverted away from residential streets, most of the residents' concerns would be resolved. That did not prove to be accurate. Complaints by residents of Deepwood continued, as did the efforts of staff to reassure the elected officials. On May 18, 1983, a City employee sent a memo to a City Councilwoman describing the site and indicating that no contaminants were found in the soil or water table and that continued monitoring was to take place every four to six months for five years. Again, despite these assurances, residents continued to complain that trash was being dumped at the site.

The City Council remained attentive, if ineffectual, requesting that the Board of Adjustment hold a public hearing to consider terminating the nonconforming use of the site. The resolution requesting the hearing pointed to the operation of a "stone, sand, or gravel mining use" on the property. It did not

3

mention the complaints that it was being used as an illegal dump.

The Board of Adjustment held the requested hearing on July 26, 1983 to consider revoking the certificate of occupancy for the nonconforming sand and gravel mining operation. The board members visited the site on the morning of the hearing. In preparation for the inspection, however, Van Sickle had moved the trash and covered it with dirt. At the hearing, he testified that he had removed a considerable amount of trash from the site and that he planned to mine gravel for two more years and fill the resulting hole for another three years. Two other individuals supported continuing the nonconforming use. While two residents sent letters of opposition to this plan to the Board of Adjustment, none attended the hearing. At the conclusion of the hearing, the board decided to take no action to revoke the certificate and to call another hearing in nine months. There is no evidence in the record that the board ever again considered the matter.

While Van Sickle owned the site, two City demolition contractors dumped trash on the site. Illegal dumping continued from 1985 to 1993, and during this time the City invested little effort into deterring illegal dumping.[1] Over these eight years, the City issued fifteen citations for illegal dumping, six of which were for dumping at the Deepwood site. A 1985 memo to the mayor

---

[1] The district court noted that a coordinated effort by the Street and Sanitation Service Department, the State Health Department, the Department of Housing and Neighborhood Services, and the Public Works Department was begun in 1985 to clean up the site. This was apparently ineffective.

4

and City Council stated that the citations for illegal dumping at the site had been only a partial deterrent and noted that control of illegal dumping had been "loose."

In 1987, the City sued Van Sickle, V.V. Construction, and another defendant, Samson Horrice, for operating an illegal solid waste facility. As if to make matters plain, in 1988 the site caught fire and burned for over seven months. Finally, in December of 1989, the City obtained a judgment against the defendants ordering them to cease dumping at the site and to submit and implement a plan to close the site. But nothing changed.

The Bureau of Solid Waste Management of the Texas Department of Health inspected the site in April of 1991. The inspectors reported continued unauthorized dumping and no efforts to clean up the site as required by the 1989 judgment. According to the reports, the City was informed of the failure to clean up the site.

In November of 1991, the City moved for contempt against Van Sickle and Horrice for failure to comply with the judgment. No hearing was held because the City failed to serve one of the defendants. It appears that no further action was taken to enforce the judgment and ensure closure of the site. With this inaction, a decade of erratic enforcement staggered to a halt.

First State Bank had a lien on the site. In 1991, the Department of Housing and Neighborhood Services informed the bank that the site had been inspected and was in compliance with the City code. In 1992, First State Bank acquired the site when Van

5

Sickle defaulted on a loan, and two years later it sold the site to Herman Nethery.

On August 1, 1994, Nethery, the new owner, applied for a construction permit from the City on behalf of Herman Nethery Recycling. Nethery described the proposed project as "fill & mine property." A section of the application set aside for "office use only" contains a notation that the application was not ready because it needed an accompanying affidavit stating that the proposed use had been in continuous operation since the original certificate of occupancy was issued. An affidavit was submitted to the City on August 2, 1994, stating, "VV Construction Company is in fact in business and continuing business on said property since 1982 to present time." The affiant was V.V. Construction Co. by Herman Nethery Recycling. The same day, the City issued a permit to Nethery for mining at the site. The accompanying contractor's authorization form notes that the City had to inspect the property before Nethery could receive a certificate of occupancy.

Meanwhile, the City created an Illegal Dumping Team of six code enforcement inspectors to prevent illegal dumping at Deepwood and other sites. The inspectors issued numerous citations to people operating the site beginning on August 22, 1994. Despite the reports and citations, the City issued a certificate of occupancy to Nethery on December 5, 1994, apparently without first conducting the required inspection. The certificate allowed the operator of the site to "dump rock, gravel, sand, clean dirt free

6

of vegetation and concrete, generated from Demolition efforts associated with the Urban Rehabilitation Standards Board Demolition Program." The City continued to issue citations for illegal dumping through November of 1996.

During the time that Nethery owned it, the site was operated by Herman Lee Gibbons. Gibbons was also a subcontractor on certain City contracts for demolition and hauling debris, and he dumped waste at the site. Other subcontractors on City demolition projects did the same. Gibbons and other site operators used copies of the certificate of occupancy issued by the City to prove to their customers that the site was a legal landfill.

Kenn Hornbeck, the City employee who supervised City demolition contracts, did not seek to terminate those subcontracts assertedly because he had been provided no proof that material from City demolition projects was being dumped illegally. Yet Hornbeck knew that Gibbons was operating an illegal dump at the site, and he continued to forward contracts with Gibbons to the City Council for approval without informing them of Gibbons' connection with the dump. His department's attempts to monitor whether City demolition debris was disposed of properly were limited to checking receipts submitted for landfill disposal.

In April of 1995, the City sued Nethery for operating an illegal solid waste facility. Despite a resulting temporary injunction ordering Nethery to cease all operations at the site, illegal dumping continued through the end of 1996. Nethery was

twice held in contempt of court and, as a result, spent 49 days in jail and was ordered to pay $2,500 in fines.

On June 22, 1995, in a further attempt to eliminate the continued illegal dumping, Environmental and Health Services code inspectors, Dallas police officers, and Department of Public Safety officers arrested 29 people and issued 152 code violation citations. The depth of resistance to City regulation is evident in the fact that the regulators requested police assistance because the operators of the facility were armed.

The site again caught fire and burned from February 1997 through April 1997. In April, the City Council was briefed on the site. At the briefing, several council members made statements indicating surprise and dismay that the Deepwood site had not been corrected. On member noted that "had it been in another area of the City, it would not have occurred."

On November 14, 1997, Nethery was permanently enjoined from operating a dump at the site. In addition, both Nethery and Gibbons were charged and convicted of organized criminal activity in connection with their operation of the site. Both men were sentenced to prison, although Nethery's conviction was reversed on appeal.

## II

On February 5, 1998, homeowners filed a civil action in federal district court against the City and others seeking injunctive relief under the Resource Conservation and Recovery Act,

8

42 U.S.C. § 6901, injunctive relief and damages under 42 U.S.C. §§ 1981 and 1983, and damages under the FHA and its accompanying regulations. Plaintiffs filed a similar case on July 28, 1998 regarding a nearby dump.[2] After consolidating the two cases, the district court bifurcated the case for separate trials of the class claim for injunctive relief under § 6901 and the non-class claims for damages under the FHA and its regulations and §§ 1981 and 1983.[3] After a bench trial, the district judge granted plaintiffs' request for injunctive relief on August 27, 1999, a judgment affirmed by this court.[4]

As for damages, plaintiffs claimed violation of Equal Protection rights under 42 U.S.C. §§ 1981 and 1983, violation of the Fair Housing Act (FHA), 42 U.S.C. §§ 1364(a),(b), and violation of federal housing regulations, 24 C.F.R. §§ 100.70(b),(d)(4). The district court granted summary judgment to the City on the FHA and federal housing regulations claims.[5] After a bench trial, the court entered final judgment for the City on the remaining claims

---

[2] It appears that the plaintiffs did not seek damages for this second dump, the "South Loop 12 Dump," after the injunction was issued for both dumps.

[3] It appears that the bifurcation order ignored the claims for injunctive relief under §§ 1981 and 1983, but they became moot after the court granted the injunction under § 6901.

[4] *Cox v. City of Dallas*, 256 F.3d 281, 285 (5th Cir. 2001).

[5] *Cox v. City of Dallas*, Civ. 3:98-CV-1763-BH, 2004 WL 370242, at *5-*9 (N.D. Tex. Feb. 24, 2004) (unpublished).

under §§ 1981 and 1983.[6]  Plaintiffs appeal the rejection of their claims under the FHA and §§ 1981 and 1983, but not the rejection of their claims under the federal regulations.

## III

We review *de novo* the district court's grant of summary judgment to the City on the FHA claim.[7]

## A

Plaintiffs allege that the City violated § 3604(a) of the FHA when it failed to prevent dumping at the site.  Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."[8]

The issue here is whether the failures and omissions by the City violate the FHA by "otherwise mak[ing] unavailable or deny[ing]" a dwelling to any person because of race.[9]  In an analogous context, we have stated that "[a]lthough the 'otherwise make available or deny' phrase seems all-encompassing, its scope is

---

[6] *Cox v. City of Dallas*, No. 3:98-CV-1763-BH, 2004 WL 2108253, at *16 (N.D. Tex. Sept. 22, 2004) (unpublished).

[7] *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[8] 42 U.S.C. § 3604(a).

[9] Plaintiffs do not contend that any of the other clauses of § 3604(a) apply.

10

not limitless."[10] Plaintiffs attack the district court's conclusion that, "[t]o effect [sic] the availability of housing within the meaning of the FHA, the discriminatory actions must have a direct impact on Plaintiffs' ability, as potential home buyers or renters...to secure housing" and that "[s]ection 3604(a) protects the right of individuals to live where they choose, but it does not protect intangible interests in already-owned property such as habitability or value."[11]

Plaintiffs argue that the City violated § 3604(a) because the dump makes it more difficult for them to sell their houses and lowers the value of their houses. This claim enjoys factual support, but it is not a claim of "unavailability" or "den[ial]" of housing under a proper reading of the FHA. The failure of the City to police the Deepwood landfill may have harmed the housing market, decreased home values, or adversely impacted homeowners' "intangible interests," but such results do not make dwellings "unavailable" within the meaning of the Act.

Sister circuits deciding cases turning on the reading of "unavailable" are in accord. The Seventh Circuit, in *Southend Neighborhood Improvement Association v. County of St. Claire*, in addressing claims that the county failed to clean up and maintain adjacent properties, held that "plaintiffs' claim that the county's

---

[10] *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 531 (5th Cir. 1996) (construing an analogous clause of the FDA, § 3604(f)).

[11] *Cox*, 2004 WL 370242, at *6 (internal citations and quotations omitted).

discriminatory refusal to properly manage the properties it owns damaged their interests in neighboring properties" is "quite different from most of the practices that courts have deemed illegal under § 3604(a)."[12]  It then held that § 3604(a)

> is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons, but it does not protect the intangible interests in the already-owned property raised by the plaintiffs' allegations.
> ...
> Courts have applied this subsection to actions having a direct impact on the ability of potential homebuyers or renters to locate in a particular area, and to indirectly related actions arising from efforts to secure housing. On the other hand, the plaintiffs here do not allege that they have been hindered in an effort to acquire a dwelling, but rather that the County's conduct toward certain properties damaged their own property.[13]

In *Halprin v. Prarie Single Family Homes of Dearborn Park Association*, the Seventh Circuit discussed §§ 3604(a) and (b):

> [the] plaintiffs, however, are complaining not about being prevented from acquiring property but about being harassed by other property owners. So it is difficult to see how they can have been interfered with in the enjoyment of any right conferred on them by section 3604.
> ...
> Title VII protects the job holder as well as the job applicant, so an employer who resorts to harassment to force an employee to quit is engaged in job discrimination within the meaning of the Act. The Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing. . . . Since the focus [of Congress] was on [minority's] exclusion, the problem of how they were treated when they were included, that is, when they were allowed to own or rent homes in such areas, was not at the forefront of congressional thinking. That problem - the problem not of exclusion but of expulsion - would

---

[12] 743 F.2d 1207, 1210 (7th Cir. 1984).

[13] *Id.*

12

become acute only when the law forced unwanted associations that might provoke efforts at harassment, and so it would tend not to arise until the Act was enacted and enforced. There is nothing to suggest that Congress was trying to solve that future problem, an endeavor that would have required careful drafting in order to make sure that quarrels between neighbors did not become a routine basis for federal litigation.[14]

The Fourth Circuit, in *Jersey Heights Neighborhood Association v. Glendening*, similarly held that there was no claim under § 3604(a) for the government's decision to locate a highway near a neighborhood because the claim of the plaintiffs, as current residents, "is too remotely related to the housing interests that are protected by the Fair Housing Act."[15] The Third Circuit came to the same conclusion in *Tenafly Erv Association v. Borough of Tenafly*, where it held that the Orthodox Jewish plaintiffs, who challenged the City's removal of religious objects from utility poles, had not stated a § 3604(a) claim because they were current homeowners and the removal only made their residency less desirable, not "unavailable."[16] Along the same lines, the D.C. Circuit has held that "[b]y their plain terms [§ 3604(a),(f)(1)] reach only discrimination that adversely affects the availability of housing" rather than the "habitability."[17]

---

[14] 388 F.3d 327, 329 (7th Cir. 2004) (emphasis in original).

[15] 174 F.3d 180, 192 (4th Cir. 1999).

[16] 309 F.3d 144, 157 n.13 (3d Cir. 2002).

[17] *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 719 (D.C. Cir. 1991).

These cases buttress our conclusion that the simple language of § 3604(a) does not apply to current homeowners whose complaint is that the value or "habitability" of their houses has decreased because such a complaint is not about "availability." The discriminatory practice alleged here against current homeowners is quite unlike the discriminatory practices in other cases - for example, "racial steering," locking out owners of one race but not another, mortgage redlining, insurance redlining, exclusionary zoning - where the availability of housing for prospective owners or tenants is implicated.[18]

---

[18] *Evans v. Tubbs*, 657 F.2d 661, 663 n.3 (5th Cir. 1981) (erecting gate across the only access road to properties and giving gate keys only to white owners made properties "unavailable" under § 3604(a)); *United States v. Mitchell*, 580 F.2d 789, 790-91 (5th Cir. 1978) (steering black to one section of large housing complex and indicating that no other vacancies were available violated § 3604(a)); *Southend Neighborhood*, 743 F.2d at 1209 (emphasis added), *citing Halet v. Wend Inv. Co.*, 672 F.2d 1305 (9th Cir. 1982) (discriminatory rental decisions); *United States v. City of Parma*, 661 F.2d 562 (6th Cir. 1981) (rejection of public and low-income housing and adoption of restrictive land use ordinances); *Marable v. H. Walker & Assocs.*, 644 F.2d 390 (5th Cir. 1981), *appeal after remand*, 704 F.2d 1219 (11th Cir. 1983) (unequal application of rental criteria by landlord); *United States v. Mitchell*, 580 F.3d 789 (5th Cir. 1978) (racial steering); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) (adoption of restrictive zoning law); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 297-98 (7th Cir. 1992). The non-controlling cases cited by amici do not contradict this: they either do not deal directly with § 3604(a), *see Neudecker v. Boisclair Corp.*, 35 F.3d 361, 364-65 (8th Cir. 2003); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *Honce v. Vigil*, 1 F.3d 1085, 1088-90 (10th Cir. 1993); *Byrd v. Brandeburg*, 922 F. Supp. 60, 62-66 (N.D. Ohio 1996), do not address the "availability" issue head-on, *see United States v. L&H Land Corp., Inc.*, 407 F. Supp. 576, 579-80 (S.D. Fla. 1976); *Lane v. Cole*, 88 F. Supp. 2d 402, 405-06 (E.D. Pa. 2000), or deal with situations where current owners are suing because houses have been made unavailable to others, *see supra* note 11; *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979); *United States v. Am. Inst. of Real Estate Appraisers of Nat. Ass'n of Realtors*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977). It is true that insurance redlining (although generally not mortgage redlining) may injure current owners in their capacity as current owners, in the unusual circumstance that they apply for insurance *after* purchasing a house, but the evil there is still *access* to homes for new owners/tenants - that is, the practice of insurance redlining serves to reduce access to houses to future owners, as it "indirectly relate[s] [to] actions

14

This is not to say that a current owner has no claim for attempted and unsuccessful discrimination relating to the initial sale or rental of the house, an issue we do not decide.[19] And it is not to say that a current owner or renter evicted or constructively evicted from his house does not have a claim.[20] We hold only that § 3604(a) gives no right of action to current owners claiming that the value or "habitability"[21] of their property has decreased due to discrimination in the delivery of protective city services.

Plaintiffs argue that we found, in *Hanson v. Veterans*

arising from efforts to secure housing." *See Southend Neighborhood*, 743 F.2d at 1210. Thus, it is properly within the ambit of § 3604(a). *See, e.g., NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 297-98 (7th Cir. 1992).

[19] *See, e.g., Heights v. Cmty. Cong. v. Hilltop Realty, Inc.*, 629 F. Supp. 1232, 1249 (N.D. Ohio 1983); *Cmty. Hous. Trust v. Dep't of Consumer and Regulatory Affairs*, 257 F. Supp. 2d, 208 (D.D.C. 2003); *but see Halprin*, 388 F.3d at 329 (denying § 3604(a) claim where plaintiffs "are complaining not about *being prevented from acquiring property* but about being harassed by other property owners" (emphasis added)).

[20] *See Jersey Height*, 174 F.3d at 192 (noting that plaintiffs had not alleged "that anyone has for discriminatory reasons *been evicted from his home* or denied the right to purchase or rent housing" (emphasis added)); *Clifton Terrace Assocs.*, 929 F.2d at 719-20 (noting that "the denial of certain essential services relating to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities, might result in the denial of housing" per § 3604(a)); *but see Halprin*, 388 F.3d at 329 (holding that attempted constructive eviction by orchestrated harassment campaign of neighbors and housing association was not covered by § 3604(a), and noting that plaintiffs "are complaining not about *being prevented from acquiring property* but about being harassed by other property owners" (emphasis added)).

[21] We realize that a § 3604(a) claim for "constructive eviction" would be a type of "habitability" claim – that the "habitability" has so decreased that continued residency is not objectively reasonable. We reject only those "habitability" claims that fall short of constructive eviction, leaving the question of constructive eviction for another day. *See supra* note 21 (citing *Clifton Terrace Assocs.*, 929 F.2d at 719-20 (describing the denial of certain "essential services" – a type of constructive eviction – as possibly resulting in a § 3604(a) claim)).

15

*Administration*,[22] that actions falling short of complete denial of either the right to buy *or sell* may yet be covered by § 3604(a). Plaintiffs point to language in *Hanson* said to suggest as much,[23] but it will not bear that load.   In *Hanson*, buyers and sellers alleged that the Veterans Administration discriminated against them by under-appraising houses because they were located in a black neighborhood, appraisals determining the size of the housing loans that the VA would guarantee.  We first concluded that at least one plaintiff - a man who had been precluded from purchasing a particular house by virtue of the under-appraising - had standing to sue under § 3604(a).  Consistent with our holding that § 3604(a) is not available for current owners who claim merely a decrease in value or habitability, we assessed only the standing of a specific *buyer* who had been *precluded* from acquiring his chosen home.  Even if one focuses on the fact that the court in *Hanson* allowed current homeowners to sue, the heart of the case was about unavailability for buyers - specific sales and purchases were being blocked.

---

[22] 800 F.2d 1381 (5th Cir. 1986).

[23] *Id.* at 1386 ("Courts have consistently given an expansive interpretation to the Fair Housing Act; to state a claim under the Act, it is enough to show that race was a consideration and played some role in a real estate transaction");

> We conclude that section 804(a) [§3604(a)] does address the claim asserted by appellants. Discriminatory appraisal may effectively prevent blacks from purchasing or selling a home for its fair market value. This interferes with the exercise of rights granted by the Fair Housing Act.

*Id.*

This reading of the case aligns it with the cases it cited. In *Hanson*, we explained that, in *United States v. Mitchell*,

> the district court found that the defendant, which owned an apartment complex, steered black tenants to a particular section of the complex and that this effectively denied the black tenants access to equal housing opportunities. We affirmed the conclusion of the district court that these acts by the defendant made unavailable or denied "a dwelling to any person because of race." We held that "steering evidences an intent to influence the choice of the renter on an impermissible racial basis. The government need only establish that race was a consideration and played some role in the real estate transaction.[24]

*Hanson* also cited *Moore v. Townsend*,[25] where the Seventh Circuit dealt with defendants who had refused to negotiate with plaintiffs because plaintiffs were black and had thereby prevented the plaintiffs from acquiring the home. The court affirmed the district court's award of specific performance to the plaintiffs, noting that "[r]ace is an impermissible consideration in a real estate transaction, and it need only be established that race played some part in the *refusal to deal*."[26] This is consistent with our reading of § 3604(a) because the refusal to deal involved the acquisition, not value or "habitability," of housing.

Plaintiffs also argue that the dump has made housing

---

[24] *Hanson*, 800 F.2d at 1386 (quoting *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978) (citations omitted)).

[25] 525 F.2d 482 (7th Cir. 1975).

[26] *Id.* at 485 (emphasis added). Although claims were brought under both § 3604(a) and § 1982, the court apparently addressed only the latter; nonetheless, the case is consistent with our holding.

17

"unavailable" because the land underneath the dump is now unavailable for housing for them or prospective residents. The court in *Jersey Heights*, in rejecting the same argument, held that the government, at most, made "unavailable" a portion of land that *could* at some future time become host to homes, a possibility insufficient to sustain an FHA claim.[27] We agree. Although it is true that the statutory definition of "dwelling" includes "vacant land which is offered for sale or lease for the construction or location thereon" of residential buildings,[28] there is no indication that the Deepwood site, other than being partially zoned residential, was offered for sale for the construction of residential buildings; furthermore, there is no guarantee that housing would have been constructed on the land, even had the City stringently enforced its dumping laws. In addition, there is no indication that other land is not available for housing. And, even if there were no other land available for housing, it is not clear that such a fact would be sufficient for a § 3604(a) claim,[29] an issue we need not decide. The "unavailability" of the land

---

[27] *Jersey Heights*, 174 F.3d at 192-93 (plaintiffs claimed that the highway "will serve as the northern boundary to their community, closing off expansion in that direction and locking African Americans into what is allegedly the only neighborhood open to them").

[28] 42 U.S.C. § 3602(b).

[29] *See Jersey Heights*, 174 F.3d at 192-93 (holding that § 3604(a) was not violated even where there was allegedly no land for expansion)

18

underneath the dump does not support the FHA claim.[30]

Because housing was not made "unavailable" to plaintiffs, the district court's rejection of their § 3604(a) claim was proper.

B

Plaintiffs also allege that the City violated § 3604(b) of the FHA when it failed to prevent dumping at the site. Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[31] They contend that the City discriminated

---

[30] Finally, plaintiffs cite 24 C.F.R. § 100.70(a),(d), which interpret part of § 3604(a), for the proposition that the § 3604(a) "is violated by actions that impede, restrict[,] discourage, obstruct, or restrict persons' attempt to *sell* or buy housing or treat those persons' attempt to *sell* or buy housing differently because of race of color" (emphasis added). Again, however, plaintiffs have incorrectly shifted the focus (here, the focus of the regulations) from preventing restrictions on the buyers' choice to preventing restrictions on the buyers' and sellers' choice. Section 100.70(a) states that discrimination is unlawful "in connection with seeking, negotiating for, buying or renting a dwelling," not in connection with selling a dwelling. And § 100.70(c) states specifically that the acts prohibited under subsection (a) "are generally referred to as unlawful steering practices;" our case does not involve unlawful steering. Plaintiffs and amici also argue that § 100.70(d)(4), which states that refusing to provide municipal services or insurance based on race is unlawful, shows that plaintiffs have a § 3604(a) claim. However, the preface to § 100.70(d)(4) states that "[p]rohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to . . . ." Section 100.70(b) states that it is unlawful to discriminate by "engag[ing] in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to person." This language, which parrots the "otherwise make unavailable or deny" language in § 3604(a), prohibits conduct only insofar as the conduct "denies" housing or makes it "unavailable" – it does not (and cannot) expand the reach of the underlying statute. This conclusion is buttressed by the fact that the other prohibited activities listed in § 100.70(d)(1)-(3) relate to the sale or rental of a dwelling, not its continuous use, and the title of § 100.70 is "Other prohibited sale and rental conduct." And, as we have shown, the alleged actions here have not "denied" or made "unavailable" housing to plaintiffs.

[31] 42 U.S.C. § 3604(b).

19

against them in the provision of a service[32] – the enforcement of zoning laws – and they attack the district court's conclusion that § 3604(b) "applies only to discrimination in the provision of services that precludes the sale or rental of housing."[33] Even assuming that the enforcement of zoning laws alleged here is a "service,"[34] we hold that § 3604(b) is inapplicable here because the service was not "connected" to the sale or rental of a dwelling as

---

[32] The only other language in § 3604(b) that could possibly apply is that regarding the "privileges of sale." It is not clear if plaintiffs argue that they were denied such privileges (they never use the word "privileges" except in quoting the statute), and the district court analyzed only the "services" claim. Amici, however, argue the issue. Generously characterizing plaintiffs' argument to include this contention, we find it unavailing for the same reason that the "services" claim is unavailing: the privileges here are not connected to the "sale or rental of a dwelling." Amici argue that "privileges" must include the privileges of continued occupancy and quiet enjoyment, and they cite *Halprin*, 388 F.3d at 329, which they argue contains language supporting this position but rejects "inexplicably" the § 3604(b) claim. But amici never explain why "privileges" does not pertain only to the "sale or rental of a dwelling;" their argument, relying solely on the meaning of the word "privileges," is unconvincing. And their reliance on *Halprin* is misplaced. The court in that case conceded only that, "as a purely semantic matter the statutory language might be stretched far enough to reach a case of '*constructive eviction*' . . . ." (emphasis added). As we noted in Part A, *supra*, and as we note in Part B, *infra*, we do not foreclose the possibility of a § 3604(a) or (b) claim as the result of eviction or constructive eviction, because such actions may make housing "unavailable" or deny "privileges of sale" or "services."

[33] *Cox*, 2004 WL 370242, at *8.

[34] There is some authority that it is such a service. *See Southend Neighborhood*, 743 F.2d at 1210 (holding that § 3604(b) "applies to services generally provided by governmental units such as police and fire protection or garbage protection"); *Jersey Heights*, 174 F.3d at 193 (holding that § 3604(b) applies to "garbage collection and other services of the kind usually provided by municipalities" (quoting *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 424 (4th Cir. 1984)). However, there is also authority suggesting that it is not such a service. *See Clifton Terrace Assocs.*, 929 F.2d at 720 (suggesting that § 3604(b) may not apply to municipal services at all, and holding that § 3604(b) does not apply to the provision of elevator repair services); *Southend Neighborhood*, 743 F.2d at 1210 (holding that § 3604(b) does not apply to the decision where to location a highway); *Jersey Heights*, 174 F.3d at 193 (holding that § 3604(b) does not apply to a county's failure to clean up, maintain, and make safe property adjacent to a residential neighborhood). In any event, we do not decide the issue.

20

the statute requires.

The district court observed that "it is necessary to decide whether the language 'in connection with' refers to the 'sale or rental of a dwelling' or merely the 'dwelling' in general."[35] And as the district court correctly concluded, it is the former. This reading is grammatically superior and supported by the decisions of many courts.[36] There is more.

Although the FHA is meant to have a broad reach, unmooring the "services" language from the "sale or rental" language pushes the FHA into a general anti-discrimination pose, creating rights for any discriminatory act which impacts property values - say, for generally inadequate police protection in a certain area. And, unlike general discrimination prohibitions enforced by § 1983, the FHA targets private activity, does not require a governmental policy or custom, and does not require proof of both discriminatory impact and intent. While sweeping widely, the FHA does so in the

---

[35] *Cox*, 2004 WL 370242, at *7 (quoting § 3604(b)).

[36] *See, e.g, Clifton Terrace Assocs.*, 929 F.2d at 720; *Halprin v. Prarie Single Family Homes*, 208 F. Supp. 2d 896, 901 (N.D. Ill. 2002); *Laramore v. Ill. Sports Facilities Auth.*, 722 F Supp. 443, 452 (N.D. Ill. 2002). To the extent that some courts hold that general police and fire protection are within the scope of § 3604(b), one *may* be able to read their holdings as to the contrary; however, one can still conceivably connect police and fire protection to the "sale or rental of a dwelling" (especially rental). *See Southend Neighborhood*, 743 F.2d at 1210 (holding that § 3604(b) "applies to services generally provided by governmental units such as police and fire protection or garbage protection"); *Jersey Heights*, 174 F.3d at 193 (holding that § 3604(b) applies to "garbage collection and other services of the kind usually provided by municipalities" (quoting *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 424 (4th Cir. 1984)); *Lopez v. City of Dallas*, No. 3:03-CV-2223-M, 2004 WL 2026804, , at *7 (N.D. Tex. Sept. 9, 2004) (unpublished).

21

housing field and remains a housing statute - the focus of congressional concern. That the corrosive bite of racial discrimination may soak into all facets of black lives cannot be gainsaid, but this statute targets only housing. And the "services" subject to the alleged discrimination must be "in connection" with the "sale or rental of a dwelling . . . ."[37]

The claims here do not assert the requisite connection between the alleged discrimination and the sale or rental of a dwelling - that is, § 3604(b) does not aid plaintiffs, whose complaint is that the value or "habitability" of their houses has decreased.

This is not to say that § 3604(b) applies only if the plaintiff was precluded from finding housing. For example, § 3604(b) may encompass the claim of a current owner or renter for attempted and unsuccessful discrimination relating to the initial sale or rental or for actual or constructive eviction. Indeed, in

---

[37] As with 24 C.F.R. § 100.70, *see supra* note 29, plaintiffs and amici argue that § 100.65(b), which implements § 3604(b), shows that no such connection is required. However, the preface to § 100.65(b) states that "[p]rohibited actions under this section include, but are not limited to . . . ." The section referenced (section a)) states that it is unlawful to discriminate by "impos[ing] different terms, conditions, or privileges relating to the sale or rental of a dwelling or to deny or limit services of facilities in connection with the sale or rental of a dwelling." This language, which parrots the language in § 3604(b), prohibits conduct only insofar as the conduct "relat[es] to" or is "in connection with" the sale or rental of a dwelling." And the alleged conduct here does not "relate to" and is not "in connection with" any sale or rental. We recognize that, while some of the actions prohibited by the regulations - using different leases or contracts for sale and failing to process an offer or application - clearly are connected to the "sale or rental of a dwelling," others appear not to be - for instance, failing or delaying maintenance or repairs. But we decline to take such a cramped view of the latter type of actions - even they can be "connected to" the sale or rental of a dwelling, as when, for instance, such actions are aimed at evicting or constructively evicting a tenant. *See infra* note 38 and accompanying text.

22

*Woods Drake v. Lundy*, this court held that the latter situation could sustain a § 3604(b) claim.[38]  In *Woods Drake*, a landlord refused to continue renting to a tenant because the tenant entertained black guests.  The tenant vacated and sued the landlord under § 3604(b) for imposing a "whites-only" condition on the terms of his lease, and the court held that he had a claim.[39]  This was akin to constructive conviction and was a clear discriminatory condition of "sale or rental of the dwelling."

We are persuaded that the alleged service here was not "connected" to the sale or rental of a dwelling, as the statute requires.  Thus, the district court properly rejected the § 3604(b) claim.

### III

Plaintiffs also appeal the district court's judgment, after a bench trial, in favor of the City on the § 1981 and § 1983 claims.  The district court concluded that there was no proof of official action and, in the alternative, that there was no proof of discriminatory intent.

The district court's findings of fact are subject to clearly erroneous review.[40]  "A finding is 'clearly erroneous' when although

---

[38] 667 F.2d 1198 (5th Cir. 1982).

[39] 667 F.2d at 1201-02.

[40] FED. R. CIV. P. 52(a) ("In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon . . . . Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[41]  We construe the evidence in the light most favorable to upholding the district court's finding.[42] Rule 52(a) does not require the district court to "recite every piece of evidence supporting its findings" or to "sort through the testimony of each of [the] witnesses."[43]  The rule "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness. . . . It simply require[s] findings that are explicit and detailed enough to enable us to review them under the applicable standard."[44]

In much of their brief, plaintiffs assert their own version of the facts.  To that extent, their efforts are in vain.[45]  They also argue that the district court failed to consider key evidence: evidence of disparate treatment between black and white

---

credibility of the witnesses."); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).

[41] *Anderson*, 470 U.S. at 573 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotation marks omitted).

[42] *Travelhurst, Inc. v. Blandford*, 68 F.3d 958, 965 (5th Cir. 1996).

[43] *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993).

[44] *Id.* (internal quotation marks and citations omitted) (brackets in original).

[45] *Schlesinger*, 2 F.3d at 139 (footnote omitted):

In essence, the appellants list their own version of the facts and then complain that the district court violated Rule 52 by ignoring these "facts."  The district court did not ignore facts. It simply found facts contrary to the appellants' liking.

24

communities. That evidence allegedly shows that the City mishandled illegal dumping in black neighborhoods while more diligently handling illegal dumping in white neighborhoods, and that there were other illegal landfills in black neighborhoods, but not in similar white neighborhoods, that accepted City demolition debris. We have required that the district court explain or at least acknowledge such evidence in, for example, Voting Rights Act cases.[46] The City argues that this heightened recitation requirement is confined to such cases. Plaintiffs point to other types of cases insisting that the district court address contrary evidence.[47] We need not decide this question because we conclude that, even if such a requirement exists, the district court complied with it by properly explaining its conclusion that there

---

[46] *See, e.g., Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1203 (5th Cir. 1989) (stating that voting rights cases are unique and require special attention to the record); *Houston v. Lafayette County, Miss.*, 56 F.3d 606, 612 (5th Cir. 1995) (finding clear error in voting rights case and remanding for more extensive explanation of why certain statistics were rejected); *Teague v. Attala County*, 17 F.3d 796, 798 (5th Cir. 1994) ("This court is unable to discharge our appellate function in voting rights cases without more guidance by the trial court concerning its credibility choices on the welter of evidence before it.")

[47] *See, e.g., Lopez v. Current Director*, 807 F.2d 430, 434 (5th Cir. 1987) (noting in discriminatory discharge and treatment case that "[o]nly if the district court specifies which evidence it adopted and which evidence it rejected in making its finding can we properly and effectively apply the clearly erroneous standard"); *Ratliff v. Governor's Highway Safety Program*, 791 F.2d 394, 401 (5th Cir. 1986) (noting in a national origin employment discrimination case that district court "must at least refer to the evidence tending to prove and disprove the merits of the proffered explanation and state why the court reached the conclusion that the explanation has not been discredited. We have, therefore, routinely reversed a trial court that has failed to set forth sufficient findings of fact and conclusions of law in actions under Title VII."); *Collins v. Baptist Memorial Geriatric Ctr.*, 937 F.2d 190, 196-97 (5th Cir. 1991) (remanding quid pro quo claim for further consideration because that claim "was not separately focused upon" by district court).

was no official policy and implicitly discounting the contrary evidence.

Municipal liability under both[48] § 1981 and § 1983 requires proof of three elements in addition to the underlying claim of a violation of rights: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[49] The district court found that the City Council and the Board of Adjustment are policymakers and that the City Manager and the City Attorney are not policymakers.[50]

An "official policy" is either a policy statement, ordinance, regulation, etc., that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy.[51] Plaintiffs allege the latter. "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the

---

[48] *Evans v. City of Houston*, 246 F.3d 344, 358 (5th Cir. 2001) (extending the *Monnell* official action requirement to § 1981 claims).

[49] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).

[50] *Cox*, 2004 WL 2108253, at *7-*9. The parties agree that the City Council is a policymaker, but the City argues that the Board of Adjustment is not. We assume, but do not decide, that the Board of Adjustment is a policymaker.

[51] *See Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002).

26

theory that the relevant practice is so widespread as to have the force of law."[52] The policymaker must have either actual or constructive knowledge of the alleged policy.[53] Plaintiffs allege that there were two customs: 1) permitting disposal of City demolition debris in predominantly black neighborhoods; and 2) failing to protect black neighborhoods from illegal dumping.

Regarding disposal of debris from City projects, the district court acknowledged that "[t]he evidence supports the inference that City demolition debris was dumped at the Deepwood site" and that various City employees "could have, through the exercise of proper diligence, known about and stopped the dumping of City demolition debris."[54] However, the district court found that *even if* there existed such a policy, the policymakers had no actual or constructive knowledge of it. The court was swayed by statements made at a 1997 City Council meeting, finding that they "belie any prior knowledge of illegal dumping of City demolition debris at Deepwood."[55] The court concluded that "[t]here is no evidence that either policymaker [the City Council or the Board of Adjustment] had actual or constructive knowledge of this practice [dumping City

---

[52] *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 379, 404 (1997).

[53] *See Piotrowski*, 237 F.3d at 579. ("Actual or constructive knowledge of a custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

[54] *Cox*, 2004 WL 2108253, at *10.

[55] *Id.*

27

debris] at the time it occurred."[56]

This finding is not clearly erroneous. The "missing" evidence of disparate treatment of white and black neighborhoods would not impact the finding that the policymakers here had no actual or constructive knowledge that City debris was being dumped illegally at Deepwood.

As for failing to protect black neighborhoods from dumping, the district court rehashed attempts by the City to bring Deepwood back in line, including evidence of citations issued for illegal dumping, suits against Deepwood's owner and operator, a judgment requiring cessation of illegal dumping and cleanup, and the creation of an Illegal Dumping Team.[57] While the district court observed that "the City's efforts to stop the illegal dumping at Deepwood were inconsistent, inadequate, and largely ineffective for years,"[58] it concluded that the City's actions amounted to "negligence,"[59] not a custom. That conclusion is sound in law and fact.

Plaintiffs assert that the district court should be reversed

---

[56] *Id.*

[57] *Cox*, 2004 WL 2108253, at *10-*12.

[58] *Id.* at *11.

[59] In discussing the general basis for its rejection of the § 1983 claim as part of its summary rejection of the § 1981 claim, the court stated: "Plaintiffs failed to establish by a preponderance of the evidence that the City's actions were more than negligence and were the result of an intent to discriminate against them on the basis of race, rather than gross negligence."). *Id.* at *16.

28

for its failure to reference the evidence of disparate treatment between black and white neighborhoods - that is, the evidence of other black neighborhoods suffering the same plight and of white neighborhoods that were better-treated. Such a requirement of "punctilious detail"[60] goes nowhere in this case. The district court's recitation of a litany of evidence, and its conclusion that the City acted negligently, came with full awareness of this "missing evidence." Indeed, the court cited it in its denial of the defendants' motion for summary judgment, implicitly discounting its value at trial.

IV

The judgments of the district court in favor of the City are AFFIRMED.

---

[60] *Schlesinger*, 2 F.3d at 139.