Francis v. Kings Park Manor, Inc.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: April 7, 2016
Final Submission: November 22, 2016
Decided: December 6, 2019)

Docket No. 15-1823-cv

————————————————————

DONAHUE FRANCIS,

*Plaintiff-Appellant*,

v.

KINGS PARK MANOR, INC., CORRINE DOWNING,

*Defendants-Appellees*,

RAYMOND ENDRES,

*Defendant*.

————————————————————

Before:

POOLER, LIVINGSTON, and LOHIER, *Circuit Judges*.

In this appeal, we consider whether a landlord may be liable under §§ 3604 and 3617 of the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3604, 3617, and analogous provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, for intentionally discriminating against a tenant who

complains about a racially hostile housing environment that is created by and leads to the arrest and conviction of another tenant. The United States District Court for the Eastern District of New York (Spatt, *J.*) dismissed the claims of plaintiff Donahue Francis under the FHA, 42 U.S.C. §§ 1981 and 1982, and the NYSHRL, as well as Francis's other claims under New York State law. We **VACATE** the District Court's dismissal of the federal claims and the NYSHRL claims and **REMAND** for further proceedings. We **AFFIRM** the District Court's judgment in all other respects.

Judge Livingston dissents by separate opinion.

SASHA SAMBERG-CHAMPION (Yiyang Wu, John P. Relman, *on the brief*), Relman, Dane & Colfax PLLC, Washington, DC, *for Plaintiff-Appellant.*

MELISSA CORWIN (Stanley J. Somer, *on the brief*), Somer, Heller & Corwin LLP, Commack, NY, *for Defendants-Appellees.*

Vanita Gupta, Principal Deputy Assistant Attorney General, Jennifer Levin Eichhorn, Sharon McGowan, Thomas Chandler, United States Department of Justice, Civil Rights Division, Washington, DC; Tonya T. Robinson, Acting General Counsel, Michelle Aronowitz, Deputy General Counsel for Enforcement and Fair Housing, Kathleen Pennington, M. Casey Weissman-Vermeulen, Alexandria Lippincott, U.S. Department of Housing and Urban Development, Office of General Counsel, Washington, DC, *for Amicus Curiae* United States of America.

Susan Ann Silverstein, AARP Foundation Litigation, Washington, DC, *for Amicus Curiae* AARP.

LOHIER, *Circuit Judge*:

Just over fifty years ago, spurred by the assassination of Dr. Martin Luther King, Jr., Congress enacted Title VIII of the Civil Rights Act of 1968, commonly referred to as the Fair Housing Act of 1968 ("FHA" or "Act"), 42 U.S.C. § 3601 <u>et seq.</u>, a landmark piece of civil rights legislation that accompanied the Civil Rights Act of 1964 and the Voting Rights Act of 1965.  The main question before us is whether a landlord may be liable under the FHA for intentionally discriminating against a tenant based on the tenant's race.  In this case, the landlord allegedly refused to take any action to address what it knew to be a racially hostile housing environment created by one tenant targeting another, even though the landlord had acted against other tenants to redress prior, non-race related issues.  In holding that a landlord may be liable in those limited circumstances, we adhere to the FHA's broad language and remedial scope.  We therefore vacate the judgment of the United States District Court for the Eastern District of New York (Spatt, <u>J.</u>) dismissing Donahue Francis's claims under the FHA and analogous New York State law, as well as his claims under 42 U.S.C. §§ 1981 and 1982, and

3

remand for further proceedings. As for Francis's challenges to the District Court's dismissal of his other claims, we affirm.

BACKGROUND

1. <u>Facts</u>

The allegations in Francis's complaint, which we assume to be true, <u>see</u> <u>Morales v. City of New York</u>, 752 F.3d 234, 236 (2d Cir. 2014), tell a story that remains too common today. "Having lived in inner city urban communities during earlier parts of his life," and "in search of a better housing situation," in 2010 Francis signed a rental lease agreement with defendant Kings Park Manor Inc. ("KPM").[1] He soon moved into an apartment unit of a complex owned by KPM and managed by co-defendant Corrine Downing (together with KPM, the "KPM Defendants"). After several uneventful months, Francis's next-door neighbor, Raymond Endres, began to subject Francis to what can only be described as a brazen and relentless campaign of racial harassment, abuse, and threats.

---

[1] Francis entered the lease agreement pursuant to the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), commonly known as the "Section 8" public housing program.

4

The specific allegations are as follows.  See Joint App'x 11–17.  In February 2012 Francis heard Endres say "Jews, fucking Jews," while standing in front of their apartments.[2]  Endres then called Francis, who is black, a "fucking nigger."[3] On March 3, Endres approached Francis's open front door and said "damn fucking Jews," then looked at Francis and said "fucking asshole."  On March 10, Francis overheard Endres and another tenant discussing Francis "in derogatory terms."  The following day, Endres approached Francis's open front door and repeatedly called him a "nigger," then stated, "fucking nigger, close your god-darn door, fucking lazy, god-damn fucking nigger."  On March 20, Francis repeatedly called Francis a "nigger" in the parking lot of the apartment complex. By this point, Francis understandably "felt afraid, anxious, and unwelcome."  On May 14, Endres yelled "fuck you" in front of Francis's front door; the following day, Endres approached Francis, who was leaving his apartment, and said, "keep your door closed you fucking nigger."  On May 22, Endres told Francis, "I oughta kill you, you fucking nigger."  On August 10, Endres called Francis a "fucking nigger" and a "black bastard."  Finally, on September 2, 2012, Endres

---

[2] Although Francis is apparently not Jewish, he alleges that some of his neighbors complained about Endres's anti-Semitic rants in the KPM complex.
[3] For a brief history of this odious word, see RANDALL KENNEDY, NIGGER: THE STRANGE CAREER OF A TROUBLESOME WORD (2002).

stood at Francis's open front door and photographed the interior of Francis's apartment.

From the start of Endres's several-month campaign of harassment, Francis, "fear[ing] for his personal safety," contacted the police and the KPM Defendants to complain. His first call to the police on March 11 prompted Suffolk County Police Hate Crimes Unit officers to visit the KPM apartment complex, interview witnesses, and warn Endres to stop threatening Francis with racial epithets. That day Francis also filed a police report, and a police officer told the KPM Defendants about Endres's conduct. The KPM Defendants did nothing.

In May 2012 Francis called the police again and filed another police report. This time, by letter dated May 23, 2012, Francis notified the KPM Defendants directly about Endres's racist conduct between March and May 2012. The letter "report[ed] . . . Endres for racial harassment, [and] for making racial slurs directly to [Francis]." It also provided contact information for the Suffolk County police officers responsible for investigating Endres. Again, the KPM Defendants failed to do anything at all, even as little as respond to Francis's letter.

Endres's conduct persisted. His escalating racial threats to Francis finally prodded the Suffolk County Police Department to arrest Endres for aggravated harassment in violation of New York Penal Law § 240.30. On August 10, 2012, Francis sent a second letter. It informed the KPM Defendants that Endres continued to direct racial slurs at Francis and "anti-semitic, derogatory slurs against Jewish people." It also disclosed that Endres had recently been arrested for harassment.

Endres's attempt to photograph Francis's apartment on September 2 was apparently the last straw. Francis contacted the police and the following day sent the KPM Defendants a third and final letter complaining about Endres's continued racial harassment. After receiving the letter, KPM advised Downing "not to get involved," and the KPM Defendants declined to respond or follow up, even though they had "intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law." Joint App'x 19–20. As a result, Endres remained a tenant at the apartment complex.

The complaint alleges that the KPM Defendants not only failed to investigate or attempt to resolve Francis's complaints of racial abuse but, to the contrary, allowed Endres to live at the complex through January 2013 without

7

reprisal. That month, Endres's lease expired and he moved out of his apartment.

A few months later, in April 2013, Endres pleaded guilty to harassment in violation of New York Penal Law § 240.26(1). That same month, the State court entered an order of protection prohibiting him from contacting Francis.

2. Procedural History

In June 2014 Francis sued the KPM Defendants and Endres, claiming primarily that they violated §§ 3604 and 3617 of the FHA,[4] the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and that the KPM Defendants violated § 296(5) of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(5), which bars housing discrimination in New York. Francis also sued the KPM Defendants and Endres for negligent infliction of emotional distress and for violating NYSHRL § 296(6) by aiding and abetting a violation of NYSHRL § 296(5), the KPM Defendants for breach of contract and breach of the implied warranty of habitability under New York State law, and Endres for intentional infliction of emotional distress. The District Court entered a default judgment against Endres, who never appeared. The KPM Defendants moved under Rule

---

[4] Because Francis's complaint, the briefing presented to this Court, and the majority of the cases relied on in this opinion do so, we cite to the current codified version of the FHA contained in Title 42 of the United States Code, see 42 U.S.C. § 3601 et seq., rather than the numbered sections of the FHA itself as amended (§§ 804 and 818).

12(b)(6) to dismiss the claims against them for failure to state a claim. The District Court granted that motion except as to Francis's implied warranty of habitability claim, which Francis voluntarily withdrew and the District Court dismissed. The District Court then granted partial final judgment in favor of the KPM Defendants so that Francis could pursue this appeal, even though damages against Endres remained to be determined. See Fed. R. Civ. P. 54(b).

Following oral argument, we solicited HUD's views relating to a landlord's potential liability for a tenant's racial harassment of another tenant under its regulations. In response, HUD, as amicus curiae, points us to its rules designed to clarify the law in this area and urges us to recognize certain limited claims against landlords arising out of tenant-on-tenant racial harassment.

## DISCUSSION

We focus on Francis's federal claims arising under §§ 3604 and 3617 of the FHA and under the Civil Rights Act of 1866, as well as his New York claims arising under NYSHRL § 296 and for negligent infliction of emotional distress. We review the District Court's dismissal of these claims de novo, accepting the factual allegations in the complaint as true. See Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015).

9

1. Post-Acquisition Claims Under the Fair Housing Act

We start with the statutory text. As relevant to this appeal, § 3604(b) of the Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Section 3617 of the Act also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right protected by the Act. 42 U.S.C. § 3617. The language of the FHA has a "broad and inclusive compass," City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731 (1995) (quotation marks omitted), and we therefore give it a "generous construction," Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 212 (1972). Together, the Act's provisions are designed "to eliminate all traces of discrimination within the housing field." Cabrera v. Jakabovitz, 24 F.3d 372, 390 (2d Cir. 1994) (quotation marks omitted).

We first address Francis's claims under §§ 3604(b) and 3617 with the text and those principles in mind. As a threshold matter, we consider whether § 3604 prohibits discrimination occurring after a plaintiff buys or rents housing. We

hold that so-called "post-acquisition" claims that arise from intentional discrimination are cognizable under § 3604.  In other words, the FHA has <u>some</u> post-acquisition application, and we here describe only the degree of application necessary to resolve Francis's FHA claims on appeal.

Our view is rooted first in the language of the provision itself, which prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b).  Like our sister circuits, we locate in this text at least some degree of post-acquisition protection.  We agree with the Seventh Circuit, for example, that the FHA's use of the terms "privileges" and "conditions" refers not just to the sale or rental itself, but to certain benefits or protections flowing from and following the sale or rental.  <u>See</u> <u>Bloch v. Frischholz</u>, 587 F.3d 771, 779–80 (7th Cir. 2009) (en banc).  And we agree with the analysis of the Ninth Circuit, for example, that "[t]he inclusion of the word 'privileges' implicates continuing rights," indicating that the "natural reading" of the statute "encompasses claims regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling."  <u>Comm. Concerning Cmty.</u> <u>Improvement v. City of Modesto</u>, 583 F.3d 690, 713 (9th Cir. 2009).  In other

words, we rely not only on the Supreme Court's directive that we read the statute broadly, but also and more fundamentally on the statutory text itself. Cf. 42 U.S.C. § 2000e-2(a)(1) (Title VII) (banning both pre-and post-hiring racial discrimination and harassment, and similarly providing that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race" (emphasis added)); Neudecker v. Boisclair Corp., 351 F.3d 361, 364–65 (8th Cir. 2003) (where tenant's suit against property management company alleged that he was subjected to repeated disability-based harassment by fellow tenants, that he reported the harassment to the company "to no avail," and that the harassment interfered with his right to enjoy his home, Eighth Circuit concluded that such a post-acquisition "disability harassment" claim "is actionable under the FHA," relying on analogous language in the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.).

It is telling that on the issue of whether the FHA prohibits any type of post-acquisition discrimination, every other circuit faced with the issue has acknowledged that § 3604(b) at least prohibits "discrimination relating to . . .

actual or constructive eviction," which is <u>necessarily</u> post-acquisition. <u>Cox v. City of Dallas</u>, 430 F.3d 734, 746 (5th Cir. 2005); <u>see</u> <u>Modesto</u>, 583 F.3d at 714; <u>Woodard v. Fanboy, L.L.C.</u>, 298 F.3d 1261, 1263–64, 1268 (11th Cir. 2002); <u>Betsey v. Turtle Creek Assocs.</u>, 736 F.2d 983, 985–86 (4th Cir. 1984); <u>see also</u> <u>Michigan Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 347 (6th Cir. 1994). As the Seventh Circuit concluded, "in some circumstances homeowners have an FHA cause of action for discrimination that occurred after they moved in." <u>Bloch</u>, 587 F.3d at 772. In short, there is no circuit split on whether § 3604 reaches post-acquisition conduct. It does.[5]

We therefore conclude that § 3604(b) reaches conduct that, as here, "would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling" after acquisition. <u>Modesto</u>, 583 F.3d at 714; <u>see</u> <u>Wetzel v. Glen St. Andrew Living Cmty., LLC</u>, 901 F.3d 856, 866–67 (7th Cir. 2018); <u>Honce v. Vigil</u>, 1 F.3d 1085, 1088–90 (10th Cir. 1993) (a hostile housing environment claim is actionable "when the offensive behavior unreasonably interferes with use and enjoyment of the premises" and is

---

[5] The Eleventh Circuit very recently agreed, holding that § 3604(b) bars certain discriminatory conduct that occurs post-acquisition, including the discriminatory provision of services connected to the sale or rental of a dwelling. <u>See</u> <u>Ga. State Conference of the NAACP v. City of LaGrange</u>, 940 F.3d 627 (11th Cir. 2019).

"sufficiently severe or pervasive to alter the conditions of the housing arrangement" (quotation marks omitted)).

But if there were any doubt that the FHA reaches post-acquisition conduct — and we think there is none — Francis has also brought a claim under § 3617. Recall that this section makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604." 42 U.S.C. § 3617. Section 3617 more comprehensively prohibits discriminatory conduct barred by § 3604(b) and creates an independent cause of action. Based on our reading of the text of that provision, we agree with the Seventh Circuit that "[c]oercion, intimidation, threats, or interference with or on account of a person's exercise of his or her [§ 3604(b)] rights can be distinct from outright violations of [§ 3604(b)]." Bloch, 587 F.3d at 782. "For instance, if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." Id. Separate and apart from § 3604(b), then, § 3617 also applies to at least some post-acquisition conduct. As

14

we explain below, Francis has adequately alleged that the KPM Defendants violated § 3617 by interfering with his rights under § 3604(b).[6]

We add here that, consistent with our interpretation of §§ 3604 and 3617, HUD's regulations have for thirty years clearly contemplated claims based on post-acquisition conduct. In 1989, for example, HUD promulgated regulations that prohibited "[f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race," 24 C.F.R. § 100.65(b)(2), or "[l]imiting the use of privileges, services or facilities associated with a dwelling because of race. . . of an owner [or] tenant," id. § 100.65(b)(4); see Bloch, 587 F.3d at 780–81; Modesto, 583 F.3d at 713–14; Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989). The direct reference to "tenants" in § 100.65(b)(4) provides particularly strong evidence that HUD has long

---

[6] Some scholarship on the subject confirms that § 3604(b) and § 3617 encompass post-acquisition claims. See generally Robert G. Schwemm, Neighbor-on-Neighbor Harassment: Does the Fair Housing Act Make a Federal Case out of It?, 61 CASE W. RES. L. REV. 865 (2011); Mary Pennisi, A Herculean Leap for the Hard Case of Post-Acquisition Claims: Interpreting Fair Housing Act Section 3604(b) After Modesto, 37 FORDHAM URB. L.J. 1083 (2010); Rigel C. Oliveri, Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act, 43 HARV. C.R.-C.L. L. REV. 1 (2008); Robert G. Schwemm, Cox, Halprin, and Discriminatory Municipal Services Under the Fair Housing Act, 41 IND. L. REV. 717 (2008).

considered the services provision of § 3604 to apply throughout a person's tenancy.

Finally, in our view, contrary interpretations of §§ 3604(b) and 3617 would contravene Congress's intent to root out discrimination in housing and to "replace the ghettos [with] truly integrated and balanced living patterns." Trafficante, 409 U.S. at 211 (quotation marks omitted). With the objective of building a racially integrated society in mind, it would make no sense for Congress to require landlords to rent homes without regard to race but then permit them to harass or otherwise discriminate against tenants because of race. See Babin, 18 F.3d at 347 (The FHA "encompasses such overt acts as racially-motivated firebombings . . . [or] sending threatening notes.").

### 2. Landlord Liability for Tenant-on-Tenant Racial Harassment

Having concluded that the FHA encompasses post-acquisition claims, we next consider whether a landlord may be liable under the FHA for intentionally discriminating against a tenant by, as is alleged to have occurred here, choosing not to take any reasonable steps within its control to address tenant-on-tenant harassment of which it has actual notice that is specifically based on race, even though it chooses to take steps to address other forms of tenant misconduct

unrelated to race. The Seventh Circuit, which is the only other circuit to grapple with a similar issue, held that the FHA "creates liability against a landlord that has actual notice of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment." Wetzel, 901 F.3d at 859.

We agree that the text of § 3617, which forbids "interfer[ence]" with a person's "exercise or enjoyment of" his or her rights under the FHA, clearly encompasses landlord liability for a tenant's racially hostile conduct in at least some circumstances. See Wetzel, 901 F.3d at 859, 862–63. For example, a landlord who fines tenants for creating fire hazards or for littering on the premises, or who responds to complaints of certain forms of tenant-on-tenant harassment, but then watches silently as white tenants burn a cross or dump trash in front of the home of recently arrived black tenants, may be said to intentionally interfere with the tenant's rights under the FHA on the basis of race.

It is true that the text of the FHA nowhere explicitly endorses landlord liability arising from such tenant-on-tenant harassment. But we have never required every last detail of a legislative scheme to be spelled out in a statute

17

itself—especially a civil rights statute. After all, the FHA also makes no explicit reference to liability for actual or constructive eviction, even though that form of liability is widely recognized.[7] See Wetzel, 901 F.3d at 862–63, 866–67.

In urging that we affirm the District Court's dismissal of Francis's FHA claims, the KPM Defendants argue that even if a hostile housing environment claim were cognizable under the FHA, Francis failed to allege that they intentionally discriminated against him. In response, we assume without deciding that intentional discrimination is an element of an FHA violation and conclude that Francis's complaint, viewed in the light most favorable to Francis,

---

[7] Although we need not and do not rely on it to resolve this appeal, HUD's interpretation of the FHA more broadly imposes liability on landlords arising out of tenant-on-tenant harassment based on race or other protected characteristics even without a showing of intentional discrimination. In 2016 HUD published a final rule (the "Rule") amending its rules for discriminatory conduct under the FHA. See Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63,054 (Sept. 14, 2016) (codified at 24 C.F.R. pt. 100). The Rule defines hostile environment harassment in violation of the FHA as referring to "unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction." 24 C.F.R. § 100.600(a)(2). HUD's regulations, as clarified by the Rule, specifically provide that a landlord may be liable under the FHA for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party" tenant where the landlord "knew . . . of the discriminatory conduct and had the power to correct it." 24 C.F.R. § 100.7(a)(1)(iii). We express no view regarding this formulation.

18

plausibly and adequately alleges that the KPM Defendants engaged in intentional racial discrimination. Specifically, the complaint alleges that the KPM Defendants "discriminat[ed] against [Francis] by tolerating and/or facilitating a hostile environment," even though the defendants had authority to "counsel, discipline, or evict [Endres] due to his continued harassment of [Francis]," and also had "intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law." Joint App'x 19–20. In other words, Francis has, in our view, adequately and plausibly alleged both that the KPM Defendants were actually aware of Endres's criminal racial harassment of Francis — harassment so severe that it resulted in police warnings and the arrest and eventual conviction of Endres — and that the defendants intentionally refused to address the harassment <u>because</u> it was based on race, even though they had addressed <u>non-race–related</u> issues in the past, including, it is reasonable to infer, tenant-on-tenant harassment. <u>See</u> <u>Wetzel</u>, 901 F.3d at 864. Accepting these allegations as true, the KPM Defendants "subjected [Francis] to conduct that the FHA forbids." <u>Id.</u>

Discovery may show that the KPM Defendants in fact tried but failed to address Francis's complaints. Or it may unfold that the defendants also declined

19

to address other, similar complaints unrelated to race, or that they were powerless to address Endres's conduct.[8]  But Francis is entitled to discovery regarding these issues.

For these reasons, we vacate the District Court's dismissal of Francis's FHA claims and remand for further proceedings relating to those claims.[9]

3.  <u>The Civil Rights Act of 1866</u>

The District Court dismissed Francis's claims under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, because he failed to allege that the KPM Defendants acted with racial animus, rather than deliberate indifference.  In an action under §§ 1981 or 1982, a plaintiff must allege three elements:  First, that the plaintiff is a member of a racial minority; second, that the defendant intended to discriminate based on the plaintiff's race; and third, that the discrimination

---

[8] The KPM Defendants also argue Francis has failed to establish that the alleged incidents between him and Endres were because of his race.  Viewing the allegations in the complaint in the light most favorable to Francis, it is hard for us to see how this could be so, but in any event we leave that question to be resolved by the District Court on remand.

[9] Our dissenting colleague has elected to shadowbox with a prior opinion that was withdrawn by collegial agreement.  Relying on a withdrawn opinion is, in our view, an error that does not serve our Court as an institution.  We note, too, that our colleague separately spars with a "<u>sub silentio</u>" opinion that (apparently) again is woven from the withdrawn opinion but bears little resemblance to the actual, narrow holding of the majority opinion filed today.

concerned one of the enumerated statutory activities (here, to make and enforce contracts (§ 1981) and to lease property (§ 1982)). Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). In this case, only the second factor is in dispute. The KPM Defendants maintain that Francis needed to allege that they intended to discriminate on the basis of race, while Francis claims that it is enough to allege their deliberate indifference to Endres's discriminatory conduct. We can avoid this dispute because, as we explained above, Francis has adequately alleged that the KPM Defendants intentionally discriminated against Francis. See Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015) ("To state a discrimination claim under . . . § 1981, plaintiffs must sufficiently allege that defendants acted with discriminatory intent."); Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999) (defendant liable under § 1981 where it "intended the discrimination to occur"); see also Sherman v. Town of Chester, 752 F.3d 554, 567 (2d Cir. 2014) ("For both [§§ 1981 and 1982] claims, [a plaintiff] must allege facts supporting [a defendant's] intent to discriminate against him on the basis of his race."). We therefore vacate the District Court's dismissal of Francis's §§ 1981 and 1982 claims and remand for further proceedings relating to those claims.

### 4. State Law Claims

Finally, Francis challenges the District Court's dismissal of his claims under NYSHRL §§ 296(5) and 296(6), as well as its dismissal of his claim for negligent infliction of emotional distress under New York State law. We address each challenge in turn.

#### a. New York Executive Law

Section 296(5) of the NYSHRL, like the FHA, prohibits housing discrimination and provides in relevant part: "It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent . . . [t]o discriminate against any person because of race . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith." N.Y. Exec. Law § 296(5)(a)(2); see also id. § 296(6) (prohibiting aiding and abetting "any of the acts forbidden under this article"). Stating a housing discrimination claim under New York State law is substantially similar to stating a housing discrimination claim under the FHA. See Stalker v. Stewart Tenants Corp., 940 N.Y.S.2d 600, 602–03 (1st Dep't 2012) (noting the "substantial identity between the language and purposes of Executive Law § 296(5) and those of the

federal Fair Housing Act"). Indeed, "[c]laims under the FHA and [§] 296 are evaluated under the same framework." Olsen v. Stark Homes, Inc., 759 F.3d 140, 153 (2d Cir. 2014) (quotation marks omitted). The District Court understood this point, concluding that Francis's "claim under [§] 296(6) fail[ed] as a matter of law" for the same reasons that his FHA claims failed. Francis v. Kings Park Manor, Inc., 91 F. Supp. 3d 420, 434 (E.D.N.Y. 2015).

Because we conclude that the FHA claim must proceed rather than fail, we vacate the District Court's dismissal of Francis's claims under § 296 and remand for further proceedings.

### b. Negligent Infliction of Emotional Distress

The District Court dismissed Francis's claim for negligent infliction of emotional distress on the ground that a landlord owes no common law duty of care to prevent one tenant from harassing another tenant. But as we explained above, the KPM Defendants may have had a duty arising from the FHA itself. Nevertheless, we affirm for the separate reason that any injury for negligent infliction of emotional distress "is compensable only when [it is] a direct, rather than a consequential, result of the breach" of a duty that a defendant owes to a

23

plaintiff.[10] <u>Kennedy v. McKesson Co.</u>, 58 N.Y.2d 500, 506 (1983). Here, as alleged in the complaint and when viewed in the light most favorable to Francis, the KPM Defendants' intentional breach of any duty they may have owed Francis did not directly result in Francis's emotional distress, which Endres directly caused with his continued campaign of racial harassment.

CONCLUSION

We have considered the parties' remaining arguments and conclude that they are either without merit or, as with the KPM Defendants' arguments based on the First, Fourth, and Fourteenth Amendments, forfeited. For the reasons set forth above, we **VACATE** the District Court's dismissal of Francis's claims under the FHA, §§ 1981 and 1982, and NYSHRL § 296, and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the District Court's judgment in all other respects.

---

[10] Under New York law, a claim for negligent infliction of emotional distress requires at least a causal connection between the conduct and the injury. <u>See</u> <u>Mortise v. United States</u>, 102 F.3d 693, 696 (2d Cir. 1996); <u>Jason v. Krey</u>, 875 N.Y.S.2d 194, 195 (2d Dep't 2009).

24

DEBRA ANN LIVINGSTON, *Circuit Judge*:

According to the majority, the principal question this case presents is whether a landlord may be liable under the Fair Housing Act of 1968 (the "FHA"), 42 U.S.C. § 3601 et seq., "for intentionally discriminating against a tenant based on the tenant's race." Maj. Op. at 3. But there is no question about that at all. Section 3604(b), one of two FHA provisions at issue here, expressly *makes it unlawful*, in relevant part, "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race, color, religion, sex, familial status, or national origin."[1] If the "limited" question identified by the majority were truly the principal one presented, *id.*, it would not have required an opinion, let alone more than three years, the solicitation of an agency's views, and the filing of *two* majority opinions to arrive at a decision.

This case instead calls on us to determine *another* issue: whether the FHA is properly construed to impose a duty on landlords, not merely to refrain *themselves* from discriminating in the terms, conditions, or privileges offered in connection with a lease, but to remediate the harassing behavior of *tenants*, *see* Draft Op. at 9,

---

[1] And § 3617, the second provision, makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by [§ 3604]."

1

thereby forcing landlords to monitor and (expeditiously) correct such behavior, however that is to be done. As to that issue, the majority repeatedly assures that it merely recognizes "limited claims against landlords arising out of tenant-on-tenant racial harassment." *Id.* But make no mistake: Sections 3604(b) and 3617 cannot bear the interpretation imposed on them today, which has no support in the FHA's text, our precedent, or the background tort principles that informed Congress at the time the FHA was enacted. Repeating the central errors of its first opinion and compounding them twice over by now simply disregarding the allegations of the complaint, the majority steers our FHA jurisprudence into "uncharted territory," *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 864 (7th Cir. 2018), where courts improbably discover new causes of action in half-century-old provisions, heedless of the deleterious consequences for parties, courts, and the housing market. I again respectfully dissent.

I

I begin with the complaint's allegations and with the unusual procedural history that has resulted in this current resolution of the KPM Defendants' motion to dismiss. In May 2010, Donahue Francis ("Francis" or "Plaintiff") moved to Kings Park Manor, a "quiet residential complex" on Long Island. Joint Appendix

2

("J.A.") 8. Almost two years passed without incident. *Id.* But in February 2012, Francis's neighbor, Raymond Endres, began a "series of [racially motivated] verbal assaults" against Francis, an African American. *Id.* Francis notified the Suffolk County Police Hate Crimes Division of his neighbor's unlawful conduct, and police promptly began an investigation. Francis did not mention these incidents to the KPM Defendants, however, for almost three months. Instead, he renewed his lease without comment. J.A. 33. Moreover, in May 2012, when Francis finally *did* alert the KPM Defendants of Endres's egregious conduct and the ongoing police investigation, Francis did not even at *that* time request any action on his landlord's part. As for the perpetrator, Endres was shortly thereafter arrested and charged with aggravated harassment.

Endres's lease came up for renewal at the end of the year. Notably, the KPM Defendants *declined to renew Endres's lease* in November 2012, within a year of the original incident and only a few months after they received notice from Francis about the harassment. Endres thereafter vacated Kings Park Manor in January 2013. Francis does not allege that any harassment transpired in the period between the nonrenewal of Endres's lease and Endres's departure. J.A. 81. So far as the record reflects, Francis continues to live at Kings Park Manor

3

today.

Francis brought suit against the KPM Defendants in June 2014, claiming primarily that his landlord had violated §§ 3604 and 3617 of the FHA and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982.[2]   In August 2014, the KPM Defendants moved to dismiss the complaint.   The district court (Spatt, *J.*) granted that motion, concluding as to the FHA claims that even assuming these claims were otherwise viable, both §§ 3604(b) and 3617 require intentional discrimination on the part of a defendant and that Francis had alleged "no basis for imputing the allegedly harass[ing] conduct to the KPM Defendants as opposed to Endres, or that the KPM Defendants failed to intervene on account of their own racial animus toward the Plaintiff."   *Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 433 (E.D.N.Y. 2015).   As Judge Spatt observed, Francis had made "no allegation of derogatory remarks directed at him by a KPM agent, disparate treatment based on race, or any allegations of circumstantial evidence supporting an inference of discrimination on [the] basis of race."   *Id.* at 426.   Accordingly, neither Francis's FHA claims nor his §§ 1981 and 1982 claims—also requiring intentional

---

[2] Francis also sued Endres, who never appeared, and against whom a default judgment was entered.

4

discrimination on the part of the KPM Defendants—could proceed.

When this appeal was argued over three years ago, on April 7, 2016, Francis asserted that the question presented was "whether the FHA should be read to impose an obligation on housing providers to remedy a discriminatory housing environment created by one tenant harassing another." Oral Argument at 49:00, *Francis v. Kings Park Manor*, (No. 15-1823). Francis's brief on appeal did not contend that the complaint plausibly alleged intentional discrimination on the part of the KPM Defendants, but instead primarily urged this Court to impose liability under the FHA for the "*negligent* failure to remedy a discriminatory [housing] environment." Br. Pl-Appellant at 14 (emphasis added).[3] After argument, the panel solicited input from the Department of Housing and Urban Development ("HUD"), asking the agency to convey its past practices addressing "whether landlords may be liable under the Fair Housing Act for failing to correct and end tenant-on-tenant discriminatory harassment." Letter to the U.S. Department of Housing and Urban Development Requesting Amicus Curiae Briefs, *Francis v.*

---

[3] Francis's failure to plead discriminatory intent was emphasized by the KPM Defendants, moreover, in briefing that went unrefuted by Francis. Br. Def-Appellee King's Park Manor at 18 (noting its conclusion, uncontradicted by Plaintiff, that "Francis [does not] contend that there are any facts to support a finding that KPM or Downing elected not to intervene in the dispute based upon their own racial animus").

5

*Kings Park Manor*, 2d Cir. No. 15-1823, ECF No. 102. HUD responded with an amicus brief and a brand-new legislative rule (enacted *after* this litigation began) which provides that a landlord may be liable under the FHA for "failing to take prompt action to correct and end a discriminatory housing practice by a third-party" *irrespective* of whether the landlord herself harbored any racial animus. *See* 24 C.F.R. § 100.7(a)(1) (the "HUD Rule"); *see also* Maj. Op. at 18 n.6 (interpreting this language to extend to "'a discriminatory housing practice by a third-party' tenant" (quoting the HUD Rule)).

The majority's original opinion relied heavily on the HUD Rule and an analogy to Title VII case law in holding that the FHA imposes liability on landlords for "failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another," *regardless* of the landlord's discriminatory intent. *Francis v. Kings Park Manor, Inc.*, 917 F.3d 109, 114 (2d Cir.), *opinion withdrawn*, 920 F.3d 168 (2d Cir. 2019) (*Francis I*). That opinion and my original dissent were withdrawn within a month of their issuance.[4] Now, the

_____

[4] As to the §§ 1981 and 1982 claims, the majority opinion broke new ground there too by concluding that Francis need not plead intentional discrimination as to these claims either, but only the KPM Defendants' "deliberate indifference to Endres's discriminatory conduct." *Francis I*, 917 F.3d at 125. This conclusion, like the majority's reliance on the HUD Rule, has been excised from the new

6

majority offers a *new* opinion that again rejects the district court's able analysis, but this time based on a theory not even relied upon by the Plaintiff in this case: that Francis has plausibly alleged *intentional* discrimination on the part of the KPM Defendants due to their failure to intervene *in the ongoing police investigation* following Francis's notification that this investigation was underway.   This is an untenable conclusion.   Indeed, as outlined above, Francis himself does not argue that the KPM Defendants are liable because they acted with racial animus.

Left to its own devices to conjure a plausible basis for inferring intentional discrimination, the majority latches onto Francis's conclusory statement in the complaint that the KPM Defendants "have intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law."   J.A. 20.   This amounts to the claim that because the KPM Defendants did *something* with regard to *some* incident involving *some* tenant at *some* past point, the alleged failure to intervene here must have been based on racial animus.   But the majority cannot say (because the complaint does not allege) whether these *other* vaguely referenced interventions involved members of a protected class, intratenant relations, the heating system, or a shower curtain.   This "bland

---

majority opinion.

7

abstraction[ ]—untethered from allegations" regarding any *actual* interventions in either tenant-on-tenant disputes specifically or even lease violations generally – is thus a *very* far cry from what we have required in the employment context to assert a plausible claim of purposeful discrimination. *E.E.O.C. v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 257 (2d Cir. 2014); *see also Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 379 (2d Cir. 2003) (explaining that a plaintiff attempting to "show[] that the employer treated [her] less favorably than a similarly situated employee outside [her] protected group . . . must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself" (internal quotation marks omitted)).

Simply put, the "naked assertion" on which the majority relies to once again revive this complaint (after over three years of review) does not plausibly support an inference of discriminatory intent, dooming both the FHA claims and Francis's claims pursuant to §§ 1981 and 1982. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676–78 (2007) (noting that a complaint fails to state a claim "if it tenders naked assertion[s] devoid of further factual enhancement," and that pleading "purposeful discrimination requires more than . . . intent as awareness of consequences") (internal quotation marks omitted). It is no surprise that the majority comes up

8

short, given that Francis himself did not set out to plead the claim that the majority belatedly discerns. But Francis's inability to predict the majority's theory (who could?) does not license the majority to conjure a new pleading. It must point to something in the complaint "*by way of factual content*" to support its conclusion that this complaint plausibly alleges purposeful discrimination. *Id.* at 683 (emphasis added). It has not done so because there is nothing there.

To be clear, the majority does not purport to modify this Circuit's pleading standards (nor is it empowered to do so). But any faithful application of the pleading standard employed today would appear to expose *all* landlords to suit for purposeful discrimination based on the wrongful conduct of one tenant vis-à-vis another so long as such landlords have ever responded to a lease violation. Thus, when a landlord demands overdue rent payments, thus "interven[ing] against . . . tenants . . . regarding non-race-related violations of their leases," *see* Maj. Op. at 19, she assumes an ill-defined responsibility to intervene (and *immediately* commence an eviction proceeding?) whenever a tenant complains about the allegedly racially-motivated behavior of another tenant. Landlords in this Circuit may therefore face a choice between *two* lawsuits: one for violating the FHA, the other for wrongful eviction, with unforeseen consequences for those

9

improperly accused of discrimination,[5] not to mention those attempting to obtain housing on reasonable economic terms.   The district court correctly concluded in this case that the complaint is devoid of allegations suggesting that the KPM Defendants "failed to intervene on account of their own racial animus toward the Plaintiff."   *Francis*, 91 F. Supp. 3d at 433.   The majority's erroneous conclusion to the contrary cannot change this Circuit's pleading standards, but today's decision certainly sows confusion as to how those standards are to be applied.

II

Of even more concern is the majority's continued misinterpretation of the FHA.   The majority acknowledges that neither § 3604(b) nor § 3617, nor the FHA generally, "explicitly endorse[] landlord liability for tenant-on-tenant harassment."   Maj. Op. at 18–19.   The majority nevertheless adopts this new and ill-defined liability theory, and despite the caution that should arise from considering that if the FHA *truly* provided for such a cause of action, one might expect some supporting precedent in the fifty-plus years since the FHA was

---

[5] *See* Kim Barker et al., *The Eviction Machine Churning Through New York City*, N.Y. TIMES (May 20, 2018), http://www.nytimes.com/interactive/2018/05/20/nyregion/nyc-affordable-housing.html ("Even if [an eviction] case is shown to be baseless, just being sued can hurt a tenant's ability to rent a new apartment.").

10

enacted. In point of fact, and as set forth below, the provisions on which the majority relies (not to mention the background tort principles informing Congress at the FHA's enactment and the years of precedent since) are most reasonably read to *exclude* a landlord's liability in the circumstances here.

*1. Textual Analysis*

I start with the text. Section 3604(b) of the FHA makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by [§ 3604]." *Id.* at § 3617. At the start, and on the face of each provision, the statutory language requires a plaintiff to prove discrimination or related conduct *by the defendant* and would not appear to impose an ongoing duty to *prevent* discrimination by third parties.[6] As the majority concedes, neither

---

[6] Thus, typical violations of § 3604(b) by landlords have included such matters as "showing a member of a protected class fewer apartments, quoting higher rents," and "requiring [unnecessary] applications and credit checks." *Francis*, 91 F. Supp. 3d at 432 (quoting *Fair Hous. Justice Ctr. v. Broadway Crescent Realty, Inc.*, No. 10 Civ. 34 (CM), 2011 WL 856095, at *6 (S.D.N.Y. Mar. 9, 2010)).

11

provision facially contemplates liability for failing to redress tenant-on-tenant harassment. Maj. Op. at 17.

Quite the opposite. Consider first § 3617. The majority contends that a landlord's failure to redress tenant-on-tenant harassment qualifies as an "interference" with the enjoyment of a "right . . . protected by" § 3604(b). *See id.* But even assuming that § 3604(b) were otherwise applicable (and as I set out below, it is not), the majority's position constitutes a wholly untenable interpretation of the word "interfere," which contemporaneous dictionaries define as "to check, hamper; hinder; disturb; intervene; intermeddle; interpose; to enter into or take part in, the concerns of others." *Black's Law Dictionary* 951 (4th ed. 1968); *see also Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 113 (3d Cir. 2017) (defining "interfering" for the purposes of § 3617 as "the act of meddling in or hampering an activity or process" (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Webster's Third New Int'l Dictionary* 1178 (14th ed. 1961)))). Indeed, one would think that § 3617, with its prohibition on

A typical claim brought under § 3617 in this Circuit included allegations that a defendant-landlord refused to renew a sublease because the tenant's African-American boyfriend had moved in with her. *Stern v. Michelangelo Apartments, Inc.*, No. 97-CV-9532 GAY, 2000 WL 33766107, at *1 (S.D.N.Y. Jan. 24, 2000).

12

intimidation, coercion, and other inappropriate intermeddling in others' enjoyment of rights protected by § 3604, is a particularly *unlikely* place to look for a *duty to intervene* to address one tenant's harassment of another.

That brings us back to the antecedent question of § 3604's proper interpretation. The majority errs in its treatment of the plain language of this provision which, as already noted, prohibits discriminatory conduct by the defendant, and not the failure to prevent harassment by third parties. But the majority also errs in its resolution of another question long left unanswered in this Circuit: namely, whether § 3604(b) reaches *any* conduct occurring after the initial sale or rental of a residence, let alone a landlord's alleged failure to prevent and remediate the conduct of tenants commencing years after a plaintiff's lease was signed. The majority reassures that "there is no circuit split on whether § 3604 reaches post-acquisition conduct." Maj. Op. at 15. I agree. Deflecting attention to this uncontested proposition, however, the majority obfuscates the deep division that *does* exist as to the scope or degree of the provision's post-acquisition reach. It then proceeds *sub silentio* to place this Court on the wrong side of *that* division, with potentially traumatic consequences for this Circuit's housing market.

13

A brief history of the case law regarding § 3604's post-acquisition reach is necessary to explain just how badly the majority errs. First, as Judge Posner noted some years ago when analyzing the provision at issue here, "[t]he Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004). Because the FHA's central focus was "the widespread practice" in 1968 "of refusing to sell or rent homes in desirable residential areas to members of minority groups," post-acquisition problems, including "*harassing . . . neighbors*," would "tend not to arise until the Act was enacted and enforced." *Id.* at 328–29 (emphasis added). Unsurprisingly, then, nothing in the FHA suggests that Congress was trying to solve such future problems, an endeavor that, as Judge Posner suggested, "would have required [the most] careful drafting," lest disputes among neighbors become "a routine basis for federal litigation." *Id.* at 329.

Judge Posner allowed that the FHA "might be stretched far enough" in the post-acquisition context to reach *conduct* by a defendant amounting to a constructive eviction—on the theory that continued occupancy might be a privilege of the sale or rental of a home protected by § 3604(b), or that perhaps a

14

constructive eviction renders a dwelling "unavailable," as prohibited by § 3604(a).[7]

*Halprin*, 388 F.3d at 329. The Fifth Circuit has recognized such carefully circumscribed post-acquisition claims under § 3604(b).[8] The majority, however, goes *much* further. It aligns itself with the Ninth Circuit's position that the FHA reaches *any* "conduct," including a defendant's *failure* to act, "that . . . 'constitute[s] discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling' after acquisition." Maj. Op. at 17 (quoting *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 714 (9th Cir. 2009)). Section 3604(b), in the majority's articulation, thus provides "a blanket 'privilege' to be free from all discrimination from *any source*," when discriminatory action or inaction *in any way* affects residential enjoyment. *Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009) (rejecting any such "blanket privilege") (emphasis

---

[7] Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

[8] Thus, as the Fifth Circuit noted in *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005), if a landlord "refused to continue renting to a tenant because the tenant entertained black guests," such conduct, amounting to a constructive eviction, would constitute discrimination in the "terms, conditions, or privileges of . . . rental," and would be cognizable under § 3604(b), *id.* at 745–47 (discussing *Woods-Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982)).

15

added).[9]  On inspection, however, this is simply not a reasonable interpretation of the provision's reach.

The majority gets to its broad construction by interpreting the term "privileges" (in § 3604(b)'s prohibition on discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling") to encompass claims regarding *any* "'services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling'"—regardless of whether such services or facilities have any connection with the rental or sale.  Maj. Op. at 11 (quoting *Modesto*, 583 F.3d at 713).   But the term "privileges of . . . rental" simply does not have the vague and expansive scope that the majority's (and the Ninth Circuit's) interpretation affords it.   The FHA expressly defines "to rent" as "to lease, to

---

[9] Unlike Title VII, which provides a cause of action against specified *employers* who discriminate, the FHA does not identify a class of potential defendants who can be charged—so that not only landlords, but also public housing authorities, cooperative boards, block associations, real estate agents, or, indeed, *anyone*, is potentially liable. Thus, in *Modesto*, on which the majority relies, the Ninth Circuit held that a plaintiff could pursue a § 3604(b) claim alleging discrimination by a local government in the provision of law enforcement protection to homeowners or renters, and *notwithstanding the lack of any connection to a residence's sale or lease.  See Modesto*, 583 F.3d at 713–15; *cf. Ga. State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627, 633–34 (11th Cir. 2019) (rejecting the Ninth Circuit's "expansive view of [municipal] services covered by §3604(b)," but holding that a municipality's discriminatory provision of water, gas, and electricity services is actionable under the FHA because those utilities are "closely tied" to the sale or rental of a dwelling and essential to its habitability).

sublease, to let and otherwise to grant for a consideration the right to occupy the premises not owned by the occupant." 42 U.S.C. § 3602(e). Section 3604(b)'s prohibition on discrimination in the "terms, conditions, or privileges of . . . rental" is thus most reasonably read to refer to discrimination in the terms, conditions, and privileges of the *rental arrangement*—a construction that may have *some* post-acquisition application (prohibiting, for instance, constructive eviction on the basis of race) but that still ties potential liability to discrimination regarding the commitments made and benefits afforded in connection with the rental itself.

To be clear, § 3604(b) prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, *or* in the provision of services or facilities in connection therewith . . . ." (emphasis added). But this doesn't change the analysis. As the Fifth Circuit has recognized, the prohibition on discrimination in "the provision of services or facilities in connection therewith" applies specifically to "*the sale or rental* of [the] dwelling," rather than to the dwelling generally. *Cox v. City of Dallas*, 430 F.3d 734, 745 (5th Cir. 2005) (emphasis added) (holding that municipality's alleged failure to prevent dumping near the plaintiffs' homes was *not* actionable under § 3604(b) because the allegedly discriminatory enforcement of zoning laws was not "connected" to the sale or rental of the

17

dwelling).  The Fifth Circuit directly addressed § 3604(b)'s text, noting that its interpretation of the language was "grammatically superior" in requiring a relationship between the services or facilities at issue and a sale or rental.  *Id.*

The majority fails to recognize that the same limiting principle holds true for the word "privileges" in § 3604(b)'s prohibition against discrimination in the "terms, conditions, or privileges of sale or rental."  "[P]rivileges of sale or rental," like "terms and conditions," requires a connection with the sale or rental, so that not *all* alleged impairments of a person's post-acquisition enjoyment of residence are sufficiently connected to the sale or rental to trigger § 3604(b).  As the Fifth Circuit explained in requiring such a connection, the argument to the contrary, based solely on reading the word "privileges" in isolation from the statute as a whole, is notably "unconvincing."  *Cox*, 430 F.3d at 745 n.32.

So why does the majority embrace the Ninth Circuit's amorphous and atextual approach to the question of § 3604's post-acquisition reach—an approach that, as the Fifth Circuit has suggested, would appear to have the effect of affording a § 3604(b) cause of action for alleged discrimination against *anyone*, so long as their action or (as the majority would have it) their inaction could be said to "impact[] property values" or the enjoyment of a leasehold?  *Cox*, 430 F.3d at

18

746. For a simple reason. The only post-acquisition "privilege" that *has* been recognized by every circuit to have considered the question—continued occupancy—is not at issue here.[10] But after today, this doesn't matter. The majority joins the Ninth Circuit in eliminating *any* required connection between the "privileges of sale or rental of a dwelling" and the sale or rental itself. And by unmooring § 3604(b) from this limiting principle (or any other), the majority is able to discern a new FHA duty on the part of landlords (despite the lack of supporting language in the statute) to intervene in tenant-on-tenant disputes.

## 2. *Background Tort Principles and Precedent*

The problems with the majority's approach to the FHA only grow worse when considered in light of background legal principles and precedent. The Supreme Court, after all, has instructed that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action." *Meyer v. Holley*,

---

[10] Thus, the majority cannot construe Francis's allegations to state a claim for constructive eviction because, even assuming that inaction could ground such a claim, Francis's own complaint affirms that he *renewed his lease* (rendering implausible any assertion that he was constructively evicted) during the very period that the KPM Defendants were supposedly incurring liability for their inaction. *See Bloch*, 587 F.3d at 777 ("Proving constructive eviction is a tall order. . . . Ordinarily, the plaintiff in such a case must show her residence is 'unfit for occupancy,' often to the point that she is 'compelled to leave'" (quoting *Black's Law Dictionary* 594 (8th ed. 2004))).

19

537 U.S. 280, 285 (2003). Accordingly, it is appropriate to consider traditional "tort-related . . . liability rules," as the Supreme Court does, in interpreting the FHA. *Id.*[11] Here, the majority does not disagree with the district court that a landlord "owes no common law duty of care to prevent one tenant from harassing another tenant." Maj. Op. at 23. But the majority nevertheless interprets the text of the FHA—which it recognizes to be silent on the issue, *see* Maj. Op. at 18—to *alter* rather than respect this traditional tort liability rule. This analytical move contravenes a cardinal tenet of statutory interpretation that "[i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation omitted). We "assume Congress is familiar with the common-law rule and does not mean to displace it *sub silentio* in federal causes of action. A claim for damages under the FHA—which is akin to a 'tort action'—is no exception to

---

[11] There are other potential common law doctrines relevant to a landlord's responsibility for the behavior of third parties, but those sound in contract and property law rather than tort. *See, e.g.*, *Park W. Mgmt. Corp. v. Mitchell*, 47 N.Y.2d 316, 329 (N.Y. 1979) (concluding that a janitorial strike violated the implied warranty of habitability). They are thus less pertinent here, given the Supreme Court's conclusion that in the FHA, Congress "legislate[d] against a legal background of ordinary *tort-related* vicarious liability rules and consequently intends its legislation to incorporate *those rules.*" *Meyer*, 537 U.S. at 285 (emphases added).

this traditional requirement." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (internal quotation marks and citation omitted).

The majority ignores this fundamental tenet of statutory interpretation because courts in general and New York courts in particular have been *remarkably* clear: a landlord has no duty to protect a tenant from even the criminal act of another "since it cannot be said that [a] landlord ha[s] the ability or a reasonable opportunity to control [the offending tenant]." *Blatt v. N.Y.C. Hous. Auth.*, 506 N.Y.S.2d 877, 879 (2d Dep't 1986). The mere power to evict does not afford such control. *Torre v. Paul A. Burke Constr., Inc.*, 661 N.Y.S.2d 145, 146 (4th Dep't 1997); *see also Blatt*, 506 N.Y.S.2d at 879 ("The power to evict cannot be said to have furnished the [defendant] with a reasonable opportunity or effective means to prevent or remedy [the] unacceptable conduct, since the incident giving rise to the injuries sustained, and indeed, the pattern of harassment alleged by the plaintiff, arose from a purely personal dispute between the two individuals." (internal quotation marks omitted)).[12] And without some basis for control, fairness does

---

[12] In fact, under New York law, even repeated complaints to a landlord by various tenants regarding a tenant who thereafter *stabbed* another were insufficient to trigger a duty on the landlord's part, because the landlord was "not in a position to control [the] tenant's behavior." *Firpi v. New York Housing Authority*, 573 N.Y.S.2d 704 (2d Dep't 1991). Eviction is not an effective tool for regulating

21

not permit holding a landlord responsible for the misconduct of others.

Given these complexities, if the present claim were *really* discernible from the statute's text, as illuminated by background common law principles, we would expect a substantial body of FHA decisions grappling with the question of landlord liability for tenant-on-tenant harassment and discussing its proper scope. *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 80–81 (2012) ("New rights cannot be suddenly 'discovered' years later in a document, unless everyone affected by the document had somehow overlooked an applicable provision that was there all along."). But as the court below noted, over fifty years since the enactment of the FHA, the cases discussing even the *potential* of such liability are remarkably "sparse." *Francis*, 91 F. Supp. 3d at 429.

Previously, the closest cases on point (which are few and far between) recognized "hostile housing environment" claims. Under this theory of liability, plaintiffs have been permitted to move forward with claims under the FHA where a landlord's *own* "offensive behavior unreasonably interfere[d] with use and enjoyment of the premises." *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993). We

---

disputes between neighbors, the Second Department affirmed, and the "controversy [was] one for *the police*, and not for the landlord." *Id.* (emphasis added).

22

have assumed without deciding (in an unpublished summary order) that a plaintiff may state such a claim in appropriate circumstances. *Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d Cir. 2008). In all the cases from other circuits where these claims have been brought against landlords, however, the landlord or one of his agent*s* was responsible for the *actual harassment*. *See, e.g.*, *Quigley v. Winter*, 598 F.3d 938, 946–47 (8th Cir. 2010) (affirming jury's determination that landlord violated FHA where the evidence indicated that he sexually harassed a tenant when receiving rent payments).

The majority relies on one case only, the Seventh Circuit's recent opinion in *Wetzel*. *See* Maj. Op. at 17 (noting that the Seventh Circuit "is the only other circuit to grapple with a similar issue"). But that case, involving the alleged harassment on protected grounds of a senior citizen living in a senior facility, is distinguishable from the instant case.[13] To be clear, *Wetzel* does hold that the FHA

---

[13] The majority also cites fleetingly to *Neudecker v. Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003) (per curiam). But even assuming that *Neudecker* has any persuasive value, *see Halprin*, 388 F.3d at 329 (noting that *Neudecker* was not a "considered holding"), the case is simply inapposite. In *Neudecker*, the complaint alleged that the property manager's children had harassed the disabled plaintiff-tenant, while the *property managers themselves* disseminated the tenant's private medical information to other tenants and *engaged in acts of harassment*. *Neudecker*, 351 F.3d at 362–63. As these allegations indicate, the landlord's agents and their children, for whom the landlord might reasonably be held vicariously liable, were thus charged with creating the hostile environment.

23

"creates liability against a landlord that has actual notice of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment." *Wetzel*, 901 F.3d at 859. In concluding that such control was adequately alleged, however, the court pointed to the "Tenant's Agreement" governing the defendant's "residential community for older adults." *Id.* This agreement guaranteed residents, *inter alia,* the provision of three meals daily served in a central location and access to a community room. *Id.* The defendant-landlord there was alleged not only to have failed to remediate harassment of the plaintiff by other residents, but also (and importantly) to have *itself* barred the plaintiff from common spaces that she was entitled to frequent. *Id.* at 860. Under these circumstances, the plaintiff may have sufficiently alleged that the landlord "discriminate[d] . . . in the provision of *services or facilities*," *see* 42 U.S.C. § 3604(b) (emphasis added), that had been guaranteed in the rental arrangement. *Wetzel*, 901 F.3d at 867.

To the extent that *Wetzel* reads more broadly to align with the majority's opinion here, it is similarly unpersuasive. *Wetzel* acknowledges that the FHA "does not address" the question of landlord liability for third-party harassment, and that the statute "does not spell out a test" for liability under these

24

circumstances. *Id*. at 863. These concessions support my view: the statute does not "address" a distinct duty on the part of the landlord to redress harassment because the statute does not impose one. And it would be peculiar for the statute to spell out a "test" for a theory of liability found nowhere within its text. But even assuming *arguendo* that *Wetzel* was correctly decided, it is sufficiently distinguishable from the present case as to provide little, if any, support for the majority's conclusion that an FHA claim has been adequately alleged here.

*3. The Title VII Analogy*

Finally, the majority suggests (albeit only under a *"cf."* signal) that the similarity in language between Title VII and the FHA is itself enough to import some version of Title VII's "hostile work environment" standard into the context of the FHA. Maj. Op. at 12. To prevail on a hostile work environment claim, a plaintiff need not demonstrate that the employer himself engaged in the alleged harassment; rather, the employer can be liable "when a co-worker harasses the plaintiff." *Vance v. Ball State Univ*., 570 U.S. 421, 427 (2013). Far from bolstering the majority's analysis, however, the analogy to Title VII only highlights the glaring problems inherent in its theory of FHA liability—problems that explain why this analogy, so prominent in the majority's earlier effort, *see Francis I*, 917

25

F.3d at 117–118, 124, has now been relegated to a *"cf."* citation.

First, as the court below aptly noted, there are "well-known legal distinctions between the employer–employee relationship and the landlord–tenant relationship—including, that an employee is considered an agent of the employer while the tenant is not considered an agent of the landlord." *Francis*, 91 F. Supp. 3d at 429; *see also Ohio Civ. Rights Comm'n v. Akron Metro. Hous. Auth.*, 892 N.E.2d 415, 420 (Ohio 2008) ("The amount of control that a landlord exercises over his tenant is not comparable to that which an employer exercises over his employee."). This difference alone urges caution in drawing any analogy to Title VII, given that the Supreme Court consistently looks to "agency principles for guidance" in setting Title VII liability standards. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986); *see also Curtis v. Loether*, 415 U.S. 189, 197 (1974) (rejecting reasoning by analogy to Title VII in interpreting Title VIII).

But moving beyond the formalities of agency relationships, employers simply exert far more control over not only their employees, but also the entire workplace environment, than do landlords over their tenants and the residences those tenants quite literally call their own. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (noting that in those cases where an employer can be liable

for failing to address a hostile work environment created by a non-agent, we consider the "extent of the employer's control").[14] Taken collectively, an employer's ability to monitor, respond and enforce—all crucial aspects of our Title VII jurisprudence—differs substantially from the ability of a landlord to do the same. The Supreme Court has recognized that the workplace, for example, is generally characterized by "[p]roximity and regular contact" among employers, supervisors, and employees, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760 (1998), so that it is appropriate to consider, among other factors, whether an employer failed adequately to monitor workplace conditions and is properly held liable for thus permitting a hostile work environment to persist. *Vance*, 570 U.S. at 449. But landlords generally do *not* monitor their tenants to the substantial degree that employers monitor employees in order to accomplish workplace goals, nor have landlords historically solicited and maintained information about tenants' comings and goings, or their interactions with other tenants and with

---

[14] This observation also applies to the Seventh Circuit's analogy between Title IX (governing discrimination in educational environments) and the FHA. *See Wetzel*, 901 F.3d at 863–65. Our Circuit has suggested that at least some school officials exercise similar control over their students as employers do over employees. *See Summa*, 708 F.3d at 124 (holding that football coach exercised sufficient control over players to impute liability, under Title VII, for harassment of graduate-student manager). The same cannot be said for landlords and their tenants.

27

guests invited into their homes. Moreover, and significantly, Title VIII contains no evidence of a congressional intent dramatically to upend this societal reality, which many lessees may rely upon as an important aspect of residential privacy.

Just as landlords lack the capacity of employers to monitor their tenants, they ordinarily lack the tools to investigate and remediate tenant misconduct when it is reported. Appropriate remedial action in the employment context can include launching a "prompt investigation," *Russell v. N.Y. Univ.*, No. 15-cv-2185 (GHW), 2017 WL 3049534, at *29 (S.D.N.Y. July 17, 2017), ordering all staff members to "undergo sexual harassment training," *Summa*, 708 F.3d at 125, or separating the victim from the harasser, *Ingram v. West*, 70 F. Supp. 2d 1033, 1037 (W.D. Mo. 1999). Investigations in this context are a substantial undertaking. An inquiry that amounts "to nothing more than the company's interview of Plaintiff, and the union's telephone conversation with [the harasser]" will not suffice. *Holt v. Dynaserv Indus., Inc.*, No. 14-cv-8299 (LGS), 2016 WL 5108205, at *9 (S.D.N.Y. Sept. 19, 2016). But a thorough investigation that includes interviewing "twelve managers and staff" might. *See Killis v. Cabela's Retail II, Inc.*, No. 13 C 6532, 2015 WL 128098, at *13 (N.D. Ill. Jan. 8, 2015).

Such corrective actions are common in the workplace. But landlords have

28

no analogous means at their disposal to investigate and remediate alleged misconduct, even when a complaint is lodged. A landlord cannot temporarily evict a tenant or force all tenants to undergo harassment training and provide information about each other's behavior. And while an employer can transfer a problematic employee, a landlord cannot generally move tenants around different building units in response to complaints. Furthermore, even if landlords *could* develop a roster of such intermediate steps and penalties, leading up to eviction itself, we might question whether Congress sought to import such a system into the housing context, without a word as to the due process principles that this system would implicate, and that would need to be addressed.[15]

Perhaps for all the reasons noted here, the majority no longer asserts, as it

---

[15] As the New York City Housing Authority ("NYCHA") noted, during the comment period on the new HUD Rule, "resident disputes are not always clear cut." Comment of the New York City Housing Authority (Dec. 22, 2015), http://www.regulations.gov/document?D=HUD-2015-0095-0051 ("NYCHA Comment") (noting that discrimination allegations "can be difficult to verify," may involve cross-complaints, and can be lodged "as [a] way of qualifying for a transfer, or as a means to secure the eviction of a neighbor with whom [a] resident does not get along"). Given the relative weakness of a landlord's investigative toolkit, this should be a concern, particularly in light of recent reports that even a baseless eviction case can seriously impair a wronged tenant's ability to obtain housing in the future because "[s]creening companies tell landlords whether a prospective tenant has been sued for eviction, without necessarily saying how the case was resolved." Barker et al., *The Eviction Machine Churning Through New York City.*

29

did before, that landlords control residential complexes by virtue of their power to evict tenants. *See Francis*, 917 F.3d at 137. Significantly, however, the majority opinion now says *nothing at all* about the basis for concluding that Francis's allegations state a plausible rationale for holding the KPM Defendants liable. Based on the allegations in this complaint, what would the majority have had the KPM Defendants do, in response to Francis's belated notification as to Endres's conduct—particularly given that Francis himself asked nothing of them? Should they have contacted Endres in the middle of the police investigation that led to his arrest, with all the peril that might have entailed for the parties involved? Should they have attempted to interview other tenants during this period and thereby interfered with the police investigation? Should they really have commenced eviction proceedings before the conclusion of the police investigation? The majority asserts that Francis has stated a plausible claim. But if the majority cannot even *suggest* what the KPM Defendants *might have done differently* when Francis contacted them, how can the majority conclude that the FHA provides a cause of action pursuant to which these Defendants are fairly held liable for doing what they did?

III

As noted above, after this litigation commenced, HUD promulgated a regulation through the notice-and-comment process that purports to import the scope of employer liability under Title VII for employee-on-employee harassment into the housing context. *See* HUD Rule, 24 C.F.R. § 100.7(a)(1) (2016); *see also id.* § 100.7(a)(1) (extending liability to "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it."). In my earlier dissent, I took issue with the majority's heavy reliance on that Rule, noting that giving retroactive effect to a legislative rule is impermissible and that, even assuming *arguendo* the majority's erroneous premise that the Rule is interpretive, the Rule deserves no deference because it misinterprets the FHA's text, finds no support in precedent, and relies on a flawed analogy to Title VII.[16]

---

[16] As the Seventh Circuit recognized in declining to rely on the HUD Rule in *Wetzel*, "there are salient differences between Title VII and the FHA" and "more analysis than HUD [has offered]" is needed to support its position. 901 F.3d at 866. In promulgating the Rule, HUD brushed aside a slew of concerned comments from public housing providers and their legal counsel. The NYCHA, for instance, warned that the proposed rule would force public housing providers "to become the guarantor[s] of resident conduct, as well as the social services provider for mediating disputes," and that HUD had "seriously underestimate[d]" the administrative costs, which would end up diverting resources away from housing providers' primary responsibility to provide decent housing. NYCHA Comment. *See also* Comment of the Council of Large Public

31

*Francis I*, 917 F.3d at 139–41 (Livingston, J., dissenting).    Even if the Rule *did* merit

some deference, moreover, it does not plausibly apply to the KPM Defendants

here, given that the Rule, on its face, extends liability only to those with the power

to control the offensive conduct of third parties—a power that, as already noted,

is not generally present in the landlord–tenant context, and that has not been

plausibly alleged in this complaint.[17]

The majority has now abandoned the HUD Rule, which it relegates to a

footnote in which it pronounces that it "need not and [does] not rely on [the Rule]

to resolve this appeal."    Maj. Op. at 18 n.6.    In effect, the majority believes that it

---

Housing Authorities (Dec. 21, 2015), http://www.regulations/gov/document?D=HUD-2015-0095-0026 (warning, *inter alia*, of "serious declines in housing quality or even the loss of public housing units for low-income families" and of negative impact, including increased homelessness, on tenants suffering from mental illness who might trigger complaints).

[17] As noted above, the HUD Rule extends liability to a person who "fail[s] to take prompt action to correct and end a discriminatory housing practice [including any violation of 42 U.S.C. §§ 3604 or 3617] by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it."    24 C.F.R. § 100.7(a)(iii).    But nothing in the text of this Rule indicates that a landlord is liable for tenant-on-tenant harassment.    The Rule explains that "[t]he power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party."    As described above, landlords do not have the kind of extensive control over (or legal responsibility for) tenants that employers exercise over employees, and Francis pleads no special facts to suggest that the KPM Defendants exercised such control over Endres here.

has successfully avoided the many perils of its original effort by declining to address the Plaintiff's actual theory (that the FHA mirrors Title VII in imposing *negligence* liability on landlords for tenant-on-tenant harassment, just as employers are responsible for the harassing conduct of their employees) and by instead discerning in the complaint a plausible cause of action for *intentional* discrimination on the part of the KPM Defendants. As already noted, the majority's assertion that the Plaintiff has plausibly pled discriminatory intent on the part of the KPM Defendants fails to withstand even minimal scrutiny. *See infra* Part I. More fundamentally, however, this *ipse dixit* doesn't change the fact that the FHA provisions on which the majority relies do not provide for landlord liability for tenant-on-tenant harassment. Nor does this *ipse dixit* alter the background common law rules against which the FHA was enacted, or flesh out just what duty the majority is seeking to impose on landlords, so that future landlords might have some chance to comply with the legal regime that the majority conjures, without explication.

In essence, the majority's analysis is not rooted in the Plaintiff's complaint, statutory text, precedent *or* the common law, but instead floats on the FHA's "broad and inclusive compass," Maj. Op. at 10 (quoting *City of Edmonds v. Oxford*

*House,* 514 U.S. 725, 731 (1995)). But a statute's aspirational purpose does not give us a "roving license . . . to disregard clear language simply on the view that . . . Congress must have intended something broader." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (internal quotation marks omitted). And this is particularly true in construing the FHA, given that the Supreme Court has already instructed that the FHA's "overriding societal priority" of eradicating discrimination in housing does not mean that Congress abandoned traditional tort liability rules to further this goal. *Meyer v. Holley*, 537 U.S. 280, 290–91 (2003).

From now on, any landlord who fails to intervene following a tenant's complaint of another tenant's harassment on the basis of a protected ground is vulnerable to an FHA claim. The parameters of the necessary intervention, however (not to mention almost every other aspect of this newfound claim), go entirely unaddressed, even now, over three years since this case was argued before this Court. The majority brushes this concern aside, concluding that the Plaintiff is "entitled to discovery." Maj. Op. at 20. Those affected by today's decision cannot be so cavalier.

Judge Posner was correct in noting that Congress did not contemplate the problem of harassment by "neighbors" when it enacted the FHA and that if it had

34

addressed this problem, the most "careful drafting" would have been required. *Halprin*, 388 F.3d at 329. The majority is not in the position to undertake such drafting, but the substantial costs of the legal uncertainty engendered by its decision cannot be conjured away. This decision may benefit law firms and insurance companies, which sometimes profit from legal anomalies. *See* 42 U.S.C. § 3613(c)(2) (attorney's fees accorded to the prevailing party at the discretion of the court). But the winners today will not include those in pursuit of fair housing, and certainly not the renters among them, who will likely be left to foot the bill.

Today's decision is not, as the majority would have it, a step forward to "root[ing] out discrimination in housing," Maj Op. at 16. Instead, this decision, like the one issued and then withdrawn, is but another stumble along the path to ever more litigation that increases housing costs for those who rent, renders affordable housing more scarce, and risks the loss of housing for some of the most vulnerable among us. For the reasons stated herein, I respectfully dissent (once again) from the majority's decision to vacate the dismissal of the Plaintiff's federal claims, as well as his claims pursuant to the New York State Human Rights Law. I would affirm the district court's judgment in all respects.